Murder second degree; thirty years.
This is an indigent appeal. The indictment charged Kenneth Roberts, ". . . unlawfully, and with malice aforethought, killed Errol G. Cummings, by hitting him with a baseball bat. . . ."
To this charge appellant pled not guilty and not guilty by reason of insanity and on March 12, 1975, a trial was commenced.
The testimony adduced by the State was:
James E. Cummings was the father of the deceased and on November 20, 1974, about 7:00 P.M. he saw his son's body in a funeral home. He described his son as being thirty-seven years old, about five feet, ten inches in height and weighing about 135 pounds. Cummings knew the appellant and had talked with him on a number of occasions. However, he could not say how long the appellant had been living with his son, but did say it had been more than a month.
During cross-examination, Cummings testified that his son owned a small caliber pistol which he kept in his house. Further, Cummings recalled that just prior to his son's death he saw seven-hundred dollars cash in his possession.
On the morning of November 20, 1974, about ten minutes until five, Johnny Taylor crossed the intersection of Gaston Avenue and the L N railroad tracks in Montgomery, Alabama. On his return about 5:00 A.M., he noticed a car parked on the tracks. He walked over to the driver's side of the car and looked through the car window. It was raining at the time and his vision was obscured by foggy windows. When Taylor went to the window on the other side of the car, he saw a man inside. He called to him but received no response. When Taylor opened the door and looked in he saw blood. Further, he saw a man in the front seat of the car but was unable to see his face. Taylor then went home and telephoned the police. When he returned to the scene with his sister in about five minutes the police were already there and the car was in the same position as when he left.
Glen B. Cade was a member of the Montgomery Police Department and on November 20, 1974, was working as a patrolman with his partner, Officer Rigby. About 5:30 A.M. they were investigating a car on the railroad tracks at Gaston Avenue. When Cade went over to the passenger side of the car he saw a man sitting slumped over sideways on the front seat. Cade saw no one around the automobile when they arrived and remembered it was raining.
About 5:30 A.M., Lawrence Rutland, a detective for the Montgomery Police Department, went to the scene where the car was found. Two officers were there when he arrived and a two-tone green 1971 Pontiac Grand Prix was parked on the railroad tracks just south of Gaston Avenue. Rutland was on the scene about two and one-half hours and the car was moved after the investigation was completed. He recalled that the railroad tracks underneath the left-hand side of the automobile were dry when the car was moved and remembered that it had started raining about 4:48 A.M. The tires on the car were not flat but when Rutland started the car and attempted to *Page 468 
move it, he found that it was "hung-up on the track."
During cross-examination, Rutland stated the address 804 Ridgemont Avenue was discovered in a wallet found on the body when it was removed from the car. Rutland and Detective Lindsey went to the house at that address. When they entered the living room, near the front of the couch, they noticed a substance coming out of the carpet. It came up over the soles of their shoes and appeared to be blood. A red substance was also found on a piece of furniture approximately eight feet from the couch. A billfold was found in a jacket on a chair in the living room and the identification on the jacket indicated a Grady Street address with the name "Smith." According to Rutland, they went to the address and were told by Smith's father that Smith lived on Eugene Street. They searched the residence at the Eugene Street address after obtaining a search warrant. After they radioed police headquarters, they went to a "dempster-dumpster" some 300 yards from the address and found a sack of blood-stained clothing. The clothing was marked and sent to the toxicologist.
On redirect-examination, Rutland testified that, at the time they searched the car, they did not find any weapons in it or on the body.
Russell Martin Lindsey was employed by the Montgomery Police Department and on November 20, 1974, he along with other officers were investigating the scene where the car was found. Approximately fifty feet from where the car was parked on the tracks, they found a baseball bat, which was later turned over to the toxicologist.
Richard A. Roper was employed by the State Department of Toxicology and was the toxicologist assigned to the Montgomery office. About 6:00 A.M. on the day in question, he went to the scene where the car was found and after making pictures he looked into the car. Roper did not examine the contents of the car and detected no alcohol fumes in the car.
Roper testified that he performed a post mortem examination on the deceased, Earl Cummings, at Lee's Funeral Home. Roper's examination disclosed a total of six lacerations to the head area, four, which were located on the rear portion and the other two were in the brow area. There were also bruises and lacerations to the back. Further, during the examination a blood sample was taken from the body and its analysis showed type A, human blood. Based on his examination and dissection of the head area, Roper concluded death was the result of bleeding within the skull caused by injury to the brain. Roper also concluded that the lacerations and fractures were the result of multiple injuries by a blunt object and were commensurate with the type of injuries that could be caused with a baseball bat.
During cross-examination, Roper said that tests were made to determine the alcohol content of the blood but no tests were made to determine if drugs were present. According to Roper, death occurred approximately six to ten hours prior to the time of the post mortem examination.
Charles Wesley Smith was a criminalist with the Alabama Department of Toxicology and Investigation. On November 20, 1974, he went to the house at 804 Ridgemont Avenue and took pictures. Smith stated that in the center of the living room: "the carpet was heavily soaked in blood." Further, he said there was blood on the couch, pieces of furniture and spattered on all four walls. Smith stated that samples of the blood were taken from the stains in the fabric of the couch and sent to a serologist for an analysis.
Smith also recalled that Grady Arnette, a lieutenant with the Montgomery Police Department, gave him a baseball bat. He examined the bat and found visible evidence of blood.
Smith stated an examination of the interior of the automobile the body was found in, revealed a large quantity of blood. He recalled that numerous gold colored fibers scattered inside the car were of the same type found on the carpet of the house at 804 Ridgemont Avenue. *Page 469 
Smith also recalled receiving items of clothing from Officer Rutland. One of the items was a pair of slacks, which contained blood stains. The pants and other items were turned over to Lawton Yates for serological examination.
Sidney Williams was employed by the Montgomery Police Department as a detective and on November 20, 1974, he interrogated the defendant. The defendant was not under arrest at the time but Williams advised him of his constitutional rights. Williams testified that the defendant made an oral statement, which was later reduced to writing and signed by the defendant after he read it. In the statement Roberts related that he had killed Cummings by striking him with a baseball bat. Roberts also said in the statement that he did not know how many times he struck Cummings with the baseball bat and that the incident occurred about midnight. Further, Roberts stated that Cummings lay on the floor unconscious until he and Smith put Cummings' body in the automobile. The statement by Roberts also indicated that he and Smith were going to the Baptist Hospital when they stopped the car on the railroad tracks and left it.
During cross-examination, Williams recalled that in the statement, Roberts said he did not mean to kill Cummings and that Cummings had hit him first. According to Williams, Roberts also stated that he and Cummings were not involved in a homosexual act.
Further Williams recalled that Roberts stated that it was raining on the night in question and that he did not know exactly where he threw the bat on Gaston Avenue. Roberts also told Williams that the clothing he was wearing at the time of the incident was in the "dempster-dumpster" near the "projects" off Hall Street.
Lawton Yates was employed by the State Department of Toxicology as a Criminalist Serologist. Yates testified that he received certain items from Dr. Smith, containing blood stains. They were examined serologically, and he found the stains were human blood of type A.
Detective Rutland was recalled and he stated that the first time he saw the defendant, Kenneth Roberts, he was at the co-defendant, James Smith's apartment. He remembered smelling the odor of alcohol on Roberts. Rutland recalled Roberts said that he had not been at the deceased's residence on the night of the alleged murder. Roberts told him that he was in Prattville that night. Rutland stated that he was present when photographs were taken of the defendant while he was disrobed and that only a small scratch was found on his body.
Margie Johnson was living at 153 Averhart Street, Prattville, Alabama, on November 20, 1974. Prior to that date she had lived in an apartment in Montgomery. She knew Earl Cummings and said there had been a romance between them. She also knew Kenneth Roberts and according to her, he telephoned on November 20, 1974 and instructed her to say that he was with her the previous night. Johnson stated that when she was contacted by the Montgomery Police Department, she told them that Roberts had not been with her on the previous night of November 19.
Raymond Bonnett, was the road foreman of engineers for the Seaboard Coastline Railroad in Montgomery. He testified that the Seaboard Coastline Railroad had tracks that crossed Gaston Avenue. Further, he said that a train was scheduled to leave Montgomery at 6:00 A.M. on November 20, 1974, and would have crossed Gaston Avenue approximately forty-five minutes later. Bonnett recalled that the train was delayed and did not depart Montgomery until 7:35 A.M. He explained that delays were occasioned by different circumstances but he did not know of any request by the Montgomery Police Department to stop the train.
At the end of Bonnett's testimony, the State completed its case and a motion to exclude State's evidence was made by the appellant on the ground that they had not proved a case of first degree murder. The court denied the motion and the appellant called James Smith. *Page 470 
Smith testified that he saw Kenneth Roberts about 10:30 A.M. on November 19th, at Smith's house. About 5:55 P.M. he and Roberts went to Cummings' house on Ridgecrest Avenue. From that time until 12:00 that night, he and Roberts talked and read the paper. During that period he and Roberts also cleaned the water from the kitchen floor. Smith did not know the exact time when Cummings came in but remembered that Cummings started talking about the defendant's family. According to Smith, Cummings called the defendant's wife a bitch and his son a bastard and then said to the defendant: "because he weighed two hundred pounds and almost six foot tall, don't mean I can't whip your ass . . I have a reputation for whippin a m . . f . .'s ass and I don't mind upholding it."
Smith said it was at that point that Cummings hit Roberts with his fist. After Roberts shoved him away, Cummings went to the closet and returned with a bat. Cummings hit defendant in the side and they began to tussle over the bat. At that point, Roberts grabbed the bat and hit Cummings twice. Cummings then fell to the floor.
Smith testified they were unable to revive Cummings with cold water. After they were unsuccessful in telephoning for an ambulance he suggested that they take Cummings to the hospital. They had driven around and were unable to reach the "by-pass" where the Baptist Hospital was located, when they returned to Gaston Avenue. They then left the automobile on the railroad tracks because their attempts to remove it had failed. According to Smith they were going down Gaston Avenue to his brother-in-law's house to make a telephone call. Smith then became frightened when he saw the police driving toward where the car was located. He said they went to his house and were preparing to call the police when they arrived.
During cross-examination, Smith stated that he went to Cummings' house to get a wallet from a coat that he had borrowed from Cummings. He explained they did not go to St. Jude's Hospital some seven blocks away because the Baptist Hospital was the emergency facility for that night. Further, Smith stated that at the time he thought Cummings was under the influence of alcohol or drugs but would not say he was drunk. He denied telling appellant Cummings was dead and also denied any knowledge of the whereabouts of the bat.
The appellant took the stand and testified that he was forced to separate from his wife and son because of financial problems. At the suggestion of the deceased he moved to his house. While Roberts lived with Cummings he held several jobs and contributed money for food and maintenance of the house. He stated that difficulties started when he stopped giving the deceased money. Appellant said that the deceased would verbally abuse his wife and son and the deceased would become upset when he invited other people to the house. Roberts denied any homosexual relationship with the deceased and said he did not know of any homosexual activities of the deceased. He recalled that prior to the incident, he was riding with Cummings when the deceased threatened him with a gun. Appellant explained that the deceased had threatened him on several occasions and always carried a shotgun in the trunk of his car.
Appellant recalled that on the evening of the 19th, he and Smith returned to the deceased's house about five or six o'clock. When he returned he continued his mopping and that he and Smith talked. Around midnight, deceased came and began to make remarks to defendant about people visiting in his house and what people thought of the defendant living there. Deceased continued his verbal attack by slandering appellant's wife and child. At the same time, the deceased pulled appellant to his feet. Roberts said that the deceased then hit him in the face a couple of times and they began to struggle. Subsequently, he pushed the deceased away and told him that he "wanted out." Appellant testified that he did not remember how the bat became involved because: "it happened that fast, all I know and remember is the fact that there was a bat involved." *Page 471 
Appellant testified that a scuffle began over the possession of the bat and that during the scuffle, he was hit several times with it. They continued to struggle and he subsequently gained possession of the bat. He admitted striking the deceased with it several times but did not know how many. According to the appellant, the deceased fell to the floor and he and Smith wiped his head with water and a towel. Appellant said at that point Smith went out and attempted to find help and within a short time returned. Roberts and Smith then placed Cummings in the front seat of the car and drove away. Appellant was driving the car when he noticed that there was not much gas and they attempted to locate a service station. They then drove about thirty minutes and eventually came back on Gaston Avenue. According to the appellant it was foggy and raining hard when he lost control of the car and it skidded onto the tracks. Roberts and Smith walked away after they were unable to push the car off the tracks.
Appellant recalled that after they saw the police he became frightened and went to a friend's house. They did not have a telephone and he and Smith went to Smith's house. He admitting asked Margie Johnson to lie for him. Roberts said that at the time of the fight with the deceased he felt his life was in danger.
Shirley Ann McLean was the ex-wife of the deceased, Earl Cummings. She testified that after four years of marriage she filed a petition for divorce. In her testimony she said the deceased had not shot at her with a gun or physically abused her at any time. However, she acknowledged, in the interrogatories and depositions filed in support of her divorce, she had signed a statement contrary to her testimony.
During cross-examination, she stated the divorce was based on incompatibility or a "break down." Further, she said that although the divorce had become final in August, 1973, she had talked to her ex-husband on several occasions and he had not mentioned purchasing a shotgun.
 I
Prior to the beginning of the appellant's trial, the so-called "Black Muslim murder case" had just been completed in the same court and the jury was deliberating its verdict. The record reflects that during the first day of appellant's trial, and before the State's third witness had completed his testimony, the trial was interrupted. The jury hearing the other case informed the court that they had a question and at that point, the appellant's trial was stopped. The other jury was brought in while appellant's jury was still in the box and they were allowed to ask a question concerning the case they were deliberating. No objection was made by defense counsel either before the jury came in or after their departure.
Upon the return of the jury to the jury room, appellant's trial was started again and before the State's sixth witness had completed his testimony, appellant's trial was again interrupted. This time the jury deliberating the "Black Muslim murder case" announced that they had reached a verdict. They were again brought into the courtroom in the presence of the jury hearing the appellant's case and returned their verdict with a sentence of life imprisonment. After they announced their verdict they were polled in the presence of appellant's jury. During this time, certain exhibits including guns involved in the "Black Muslim's case" were exhibited before the appellant's jury. At the close of the "Black Muslim's" verdict proceedings, appellant's defense counsel moved for a mistrial on the grounds that the proceedings involving the other verdict were inflammatory and compounded the seriousness of appellant's crime.
Counsel argued that under these circumstances, appellant could not receive a fair trial. However, defense counsel stated that he did not believe that the jury in the appellant's case would confuse the issues of the two cases. In denying the motion, the court commented, it would have been "delighted" to have taken the matter up outside the presence of the jury if a request had been made. The court added that the *Page 472 
quarters were such that they did not have space to keep appellant's jury and the other jury separate.
Appellant now insists that the court's proceedings concerning the "Black Muslim" trial before the jury hearing his case were erroneous and prejudicial.
The conduct of a trial rests squarely in the discretion of the presiding judge and unless it clearly appears that there has been an abuse of discretion the appellate courts will not interfere. Cantor v. State, 27 Ala. App. 40, 165 So.2d 597,Dennison v. State, 17 Ala. App. 674, 88 So. 211.
While we believe that the better procedure would have been to dismiss appellant's jury and then respond to any questions of a deliberating jury or received their verdict, we recognize as the trial judge did, that in some of our circuits, the courtroom facilities are limited. We also note that counsel for appellant did not make his objections known, either before, during or after the first interruption. Further, he remained silent during the second interruption when the verdict was received and did not complain until the proceedings were complete.
We do not believe that the proceedings concerning the deliberating jury had a tendency to prejudice this defendant because there was no reference to the appellant's case. See:Landthrift v. State, 140 Ala. 114, 37 So. 287, and Welch v.State, 156 Ala. 112, 46 So. 856.
 II
It is contended that the trial court was in error when it allowed the district attorney to make certain comments during his questioning of appellant's witnesses. Specifically, appellant directs our attention to three particular instances to which objection was made. These are:
(1) During the cross-examination of the co-defendant, James Smith, by the district attorney, the following occurred:
 "Q. If you were trying to get him (— the deceased, Cummings) to the hospital you could have stopped the police. Now, isn't that right? And isn't it a fact that at the time you saw those police officers you were more worried about you going to the penitentiary because you had murdered him than saving Cummings' life?
"MR. MEMORY: Objection to that conclusion.
"THE COURT: OVERRULED.
"A. No, Sir."
(2) Later in the cross-examination of the co-defendant the district attorney asked about a mop shown in a photograph of the scene of the alleged crime. The co-defendant, James Smith, answered, "I guess it (— the mop) was there from Jump Street, I don't know." The following then occurred:
 "Q. Jump? What — Do you call the time you go to somebody's house Jump Street? Or when you go over there to murder somebody and beat them unmercifully, do you call that Jump Street?
"MR. MEMORY: Object to him arguing with the witness.
"THE COURT: Overruled.
"BY MR. EVANS: (Continuing)
"Q. Now, tell us what Jump Street means?"
(3) During the district attorney's cross-examination of the appellant's ex-wife, Berdine Roberts, the following occurred:
. . . . .
 "Q. And the truth of the matter is, during the time you were married to him he never held a job, for any length of time; isn't that correct, ma'am?
"A. Yes.
"Q. I know it is. Now —
 "MR. MEMORY: Your Honor, I would object to the Prosecutor testifying; his comments.
"THE COURT: Overruled."
Counsel argues that the "intemperate characterizations" were calculated to arouse and inflame the members of the jury and that this conduct resulted in a denial of appellant's constitutional right to a fair trial. *Page 473 
We have reviewed each of the foregoing instances complained of by this appellant and find that they came within the range of the State's cross-examination. The boundaries of such cross-examination is a matter addressed to the trial court's discretion. Such rulings by the trial court will not be disturbed except upon a showing of gross abuse. Vandiver v.State, 37 Ala. App. 526, 73 So.2d 566.
In our judgment, the questions propounded by the district attorney came within the limits of legitimate cross-examination.
 III
Appellant complains that improper testimony was allowed when during the cross-examination of the victim's ex-wife the prosecutor asked:
. . . . .
 "Q. Thank you. Now, would it be correct, ma'am, to say that the real reason for your divorce was incompatibility? What is called a breakdown in the law?
 "MR. MEMORY: Objection, Your Honor. This record here is the best evidence.
"THE COURT: Overruled.
 "MR. PRICE: Well, you have the interrogatories. I am asking about the terms of the divorce."
Counsel argues that the interrogatories and depositions of the divorce proceedings were in evidence and were the best evidence of a reason for the divorce.
We have considered the court's ruling in connection with the cross-examination of the deceased's divorced wife and find that the best evidence rule was not applicable. In our judgment the prosecution was within its right to cross-examine on the point in question because defense counsel had gone into the grounds for the witness' divorce.
This was a matter of permissible cross-examination and in no way an abuse of the trial court's discretion in permitting it.Vandiver v. State, supra.
 IV
Appellant complains that the trial court abused its discretion when it would not permit closing arguments beyond the time specified by the judge. Counsel argues that as a result of the court's discretion to adjourn, counsel for the defense was interrupted in the middle of his closing argument. Further he alleges that as a result of the court's discretion to adjourn, the district attorney was allowed to complete the State's opening argument but counsel for the defense was interrupted in the middle of his closing argument. Counsel insists this was a prejudicial interruption and at a crucial point of the trial which caused a loss of concentration, a break in the continuity, and a disruption in the natural flow of counsel's argument.
We examined the record on this point and found that no objection was raised by defense counsel concerning the court's adjournment. Further, we found that the court on resuming the trial, following the weekend recess, encouraged defense counsel to begin his argument anew.
Under these circumstances, we do not see the error maintained by appellant.
No error appears in the record.
AFFIRMED.
All the Judges concur.