The appellant, Randy Gerald Twilley, was indicted for the murder of James McGuire in violation of § 13A-6-2, Code of Alabama 1975. Trial resulted in a conviction of manslaughter and a sentence of ten years in the penitentiary. This appeal followed.
Evidence for the State tended to show that on June 19, 1981, a group of people from Jefferson County drove to Bailey's Bridge on Smith Lake in Winston County to fish at night from the bridge. The persons constituting the group were friends, and had frequently gone on such fishing trips to Bailey's Bridge in the past. There were several children in the group. The group carried lawn chairs and fishing equipment as well as lanterns. The lanterns were used for light on the bridge, and some were lowered near the water to attract fish.
As one automobile load of the group, which included Eddie and Charles Trammell, approached the bridge they came upon a vehicle parked in the middle of the road with both its doors open. A man, who was later identified as the appellant, was standing in the road near the vehicle urinating. This group got around appellant and after some conversation with him continued on to the bridge and began setting up their equipment for fishing. Shortly thereafter they were joined by others in the group, namely, Jim Bates and his son Todd, Billy Burchfield and his son Scott, Keith Trammell, and Jim McGuire. Jim Bates's father and mother had already arrived and were fishing, as were Jim Bates's brother, Reverend Wayne Bates, and Wayne's wife and children. All of the group had arrived at the bridge by 9:30 P.M.
Five or ten minutes after the group that included Eddie and Charles Trammell arrived at the bridge, appellant drove up and parked on the bridge. He was accompanied by O'Neal Blackwood and Nelson Key. They had been driving around the county together and drinking alcoholic beverages. There was a stray dog on the bridge, and appellant asked the group if the dog belonged to them. Eddie Trammell told him "no," whereupon appellant stated that if the dog did not belong to anyone he was going to throw it off the bridge. He threw the dog off the bridge into the lake, and stated, "If that had been my dog and somebody throwed it in the lake, I would have throwed their ass in the lake too." He also stated to Eddie Trammel, "If you don't like it, I'll throw your big ass in." Appellant, Blackwood, and Key were drinking liquor from a bottle. When the bottle was not being passed around they kept it sitting on the hood of their automobile. Appellant and Key were "drunk."
Another automobile arrived at the bridge carrying Michael Crowe and his brother Billy Crowe. The Crowes were accompanied by a small child. Appellant began taunting Billy Crowe by telling him that Key was going to throw him off the bridge. Billy Crowe attacked Key, beating him until he was unconscious. Key was so drunk that he could not defend himself. Appellant watched the assault and did nothing to interfere. The Crowes and appellant were generally harassing, vexing, and annoying the group of fishermen. They were walking around among the fishermen, telling them that they were not going to catch any fish, "mouthing off," and using profanity. They were "making fun" of one of the fishermen for wearing shorts. Appellant and Billy Crowe approached Jim McGuire, and Crowe asked McGuire if he wanted him to lower McGuire's lantern into the water. McGuire said that he did not. Appellant said to Crowe, referring to McGuire, "He's a son of a bitch, ain't he?" After standing around McGuire for a few minutes, appellant said to Crowe, "Come on. We'll come back and get the son of a bitch later." Appellant and the Crowes returned to their vehicles and started to leave, whereupon appellant called out, "Don't none of you son of a bitches leave. We'll be back in about thirty minutes." Appellant, Blackwood, *Page 1133 
Key, and the Crowes drove away in their vehicles. A short time later appellant and the two Crowes returned together in one vehicle. Appellant was driving. Michael Crowe began playing a guitar, saying that he would "sing up some fish." All three men were "hollering and cursing." One of the three set a whiskey bottle on top of the automobile.
Appellant and the Crowes walked to where Jim McGuire was fishing. McGuire had a hunting knife in a scabbard attached to his belt. Billy Crowe asked McGuire what he was doing with the knife and McGuire answered, saying that every fisherman needs a knife. Billy Crowe then said, "If you want to play with weapons, I'll go to my car and get my three-fifty-seven." He walked toward his automobile, but immediately returned, and suddenly grabbed McGuire's knife from McGuire's belt. McGuire said, "Just give me my knife back. We are just up here fishing with some kids and we'll go on home." Michael Crowe said, "Hey, let's go on and leave these guys alone. They ain't causing no trouble." Billy Crowe said, "No, I'm going to kill this mother-fucker." Then appellant grabbed McGuire by the hair and bent him backwards. Billy Crowe then stabbed McGuire with the knife, and appellant, who was holding McGuire, let him sink down onto the bridge. McGuire called out to his friend Jim Bates, "They've cut me. Jim, they've cut me." Bates ran toward McGuire and yelled for someone to get the tag number of the automobile in which appellant and the Crowes had arrived. Appellant asked Bates, "Do you want some of this too?" The knife had fallen to the ground and either appellant or one of the Crowes picked it up. It was never found. Appellant bent the tag of the vehicle down to obscure the number, but one of the fishing party bent it back up and got the tag number. Appellant and the Crowes got into their vehicle and left the scene. Shortly thereafter Jim McGuire died as a result of the stab wound.
Appellant testified in his own behalf. He stated that he did not remember stopping on the highway near the bridge and urinating, but admitted that he could have. He said, "I ain't saying I didn't and I ain't saying I did." He admitted that he was drinking. He denied throwing the dog off the bridge, and stated that O'Neal did it. He denied threatening to throw anyone off the bridge. He denied saying that they would come back and get McGuire later. He denied cursing, vexing, and harassing the members of the fishing party. He testified that he grabbed McGuire as Billy Crowe struck him with the knife, and stated that he was attempting to pull McGuire backward away from the knife to prevent him from being stabbed. He testified that although he grabbed him, he did not grab him by the hair. He stated, "I grabbed him to help him." He stated that he did not remember telling anyone that if they did not stay back they would get some of the same. He denied bending his tag down. He denied knowing what happened to the knife.
Appellant raises four issues on appeal.
 I
We will consider appellant's first and third contentions together, as they involve similar legal principles. Appellant's first issue is stated in his brief as follows: "Did the trial court erroneously admit testimony that appellant threw a dog off of a bridge on a separate visit to the scene several hours before the homicide?" His third issue is stated as follows: "Did the trial court erroneously admit testimony that appellant may have urinated on a public highway one-half mile from the scene several hours before the homicide?"
Appellant argues that the admission of the testimony concerning the incidents constituted reversible error, and violated a basic rule that evidence of offenses not charged in the indictment and having no connection therewith is inadmissible. Appellant contends that the testimony was introduced by the State in an attempt to obtain a conviction by showing, through unrelated acts, that appellant was a "depraved, aberrant individual." The State argues *Page 1134 
that the testimony concerning the throwing of the dog off the bridge and urinating in the highway was admissible as being part of the res gestae, and part of the continuous transaction, which tended to shed light upon and explain the homicide.
While the general rule is that evidence of separate crimes is inadmissible where the only probative function of such evidence is to show bad character, or an inclination or propensity to commit the type of crime for which accused is being tried,Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953), if the accused's commission of another crime or misdeed is an element of guilt, or otherwise tends to prove his guilt, then proof of such other crimes or misdeeds is admissible. Cheatham v. State,431 So.2d 1350 (Ala.Crim.App. 1983); Watson v. State,398 So.2d 320 (Ala.Crim.App. 1980), cert. denied, 398 So.2d 332 (Ala. 1981), cert. denied, 452 U.S. 941, 101 S.Ct. 3085,69 L.Ed.2d 955 (1981); Sparks v. State, 376 So.2d 834 (Ala.Crim.App. 1979); C. Gamble, McElroy's Alabama Evidence, § 69.01 (1) (3d ed. 1977).
This court has recognized several well defined exceptions which allow evidence of other crimes to be presented during trial.
In McElroy at § 70.01 (12), we read:
 "(a) General exclusionary rule applicable in homicide
 "The general rule which excludes evidence of prior and subsequent crimes, when their only probative value is to show in the defendant a tendency or disposition to commit the now-charged crime, is applicable when the accused is being prosecuted for homicide. If the evidence of other criminal acts does not fall within one of the exceptions to this general exclusionary rule then it is not to be admitted,
 "(b) Res gestae; one continuous transaction; inseparable crimes
 "The prosecution may prove the accused's commission of another crime if the evidence warrants a reasonable inference that such other crime was a part of the same transaction as the now-charged homicide. This rule is based upon the reasoning that the other crime was part of the res gestae or, with the now-charged crime, forms a part of one continuing transaction. . . .
". . .
"(e) Motive
 "Another of the primary exceptions to the general rule excluding evidence of other crimes is the principle that other crimes are admissible if they have probative value upon the issue of motive for the now-charged crime. The motive element of a homicide may take many forms. For example, it may involve malice, ill-will for the victim or it may include the purpose of the homicide. . . . Whenever a prior or subsequent crime is relevant to prove the motive for the now-charged homicide, it is admissible.
 "The most frequent application of the above rule is in murder prosecutions where malice or ill-will toward the victim is a requisite motive for the crime. . . .
 "The mental state of the accused at the time of the charged homicide may itself be considered as motive. Under that view, evidence of accused's commission of another crime of violence against a stranger to the victim, very close in time and place to the charged homicide, is admissible as tending to show that the defendant, at the time of the charged homicide, was in a reckless, dangerous or malicious mood. It should be noted that this ground for admission of other crimes will have its primary force when the court will not admit the other crimes as part of the res gestae of the now-charged homicide. (Emphasis added.)"
Also we find in McElroy at § 45.06 (1):
 "In a charge of crime, the state may prove former acts of hostility by the accused towards the victim for the purpose of showing motive in the accused and malice, if malice is an element of the offense. . . . When the act of hostility consists of former difficulty, such as a quarrel or a fight between the accused and the victim, uncertainty prevails with respect to the extent to which the facts *Page 1135 
of such former difficulty or quarrel may be proven. The general rule in this area, however, is that the moving party may show the fact, but not the details, of the former difficulty."
Finally, in McElroy at § 45.07, we see:
 "We have observed the general rule which prevents the prosecution and the accused from proving the details of a former difficulty between the victim and the accused. This rule does not apply when the former difficulty is considered as not being a separate difficulty but as being a part of a running row which steadily and rapidly leads up to the final difficulty in which the charged homicide occurred. It is stated affirmatively that a party can prove the details of a former difficulty if such difficulty and the difficulty giving rise to the homicide are considered to be parts of one continuous transaction. Some decisions have conceived the rule as being that the details may be proven if the former difficulty is within the res gestae of the charged homicide. However, your author would respectively submit that the use of the words `res gestae' in connection with the one continuous transaction rule contributes nothing to clarity and serves only to bedarken the doctrine.
 "The courts have not defined the term `one continuous transaction.' However, it is clear that the earlier difficulty may be deemed a part of the one continuous transaction culminating in the charged homicide or assault even though the earlier difficulty is to some extent separate from the final difficulty. In determining whether the earlier difficulty is a part of one continuous transaction, it appears that the courts consider the following factors: (1) the nearness in time and place of the earlier to the time and place of the final difficulty; (2) whether the earlier and the final difficulty arose from the same cause of dispute; and (3) whether such nearness of time and place and identity of dispute warrants an inference that the passion generated by the earlier difficulty probably continued with unabated heat to the time of the final difficulty."
The rule has been stated many times by the appellate courts of this State that in a prosecution for homicide, evidence of connected acts and transactions leading up to and explanatory of the killing is admissible. Byrd v. State, 257 Ala. 100,57 So.2d 388 (1952); Keith v. State, 253 Ala. 670, 46 So.2d 705
(1950); Levert v. State, 252 Ala. 308, 42 So.2d 532 (1949);Stallings v. State, 249 Ala. 580, 32 So.2d 236 (1947); McCoy v.State, 232 Ala. 104, 166 So. 769 (1936); Jordan v. State,81 Ala. 20, 1 So. 577 (1886); Golden v. State, 39 Ala. App. 361,103 So.2d 52, reversed on other grounds, 267 Ala. 456,103 So.2d 62 (1958); Sexton v. State, 28 Ala. App. 59, 180 So. 729
(1937); Newman v. State, 25 Ala. App. 526, 149 So. 724 (1933);Roberts v. State, 25 Ala. App. 477, 149 So. 356 (1933).
For example, in Byrd v. State, supra, the Supreme Court of Alabama stated:
 "It is true, however, that where there is an unbroken chain of events beginning with a prior difficulty and leading up to the killing, the chain of events leading up to the killing need not be a part of the res gestae in the sense that these events become a part of the crime itself, but they are admissible since they lead up to and tend to explain the acts, animus or intent of the defendant at the time he committed the killing."
In Newman v. State, supra, the Alabama Court of Appeals stated:
 "In a prosecution for homicide, evidence of connected acts and transactions leading up to and explanatory of the killing is admissible. These acts and circumstances need not necessarily be a part of the res gestae, in a sense that they become a part of the crime itself, but they are admissible where they throw any light upon the acts, animus, or intent of the defendant, and in this case the mental attitude of the defendant at the time of the fatal difficulty as bearing on the question of freedom from fault. . . ."
(Emphasis added.) *Page 1136 
In the case of Sexton v. State, supra, the Court of Appeals held that evidence of details of a prior difficulty between the deceased and the defendant was admissible in a murder prosecution, to show whether the defendant was in fact an accessory, and not the principal. The court stated:
 "The actions and circumstances need not necessarily be a part of the res gestae, in the sense that they become a part of the crime itself, but they are admissible where they throw any light on actions, crimes, or intent of the defendant, or his mental attitude at the time of the fatal difficulty, and his participation therein as being an accessory."
(Emphasis added.)
In Jordan v. State, supra, the court stated:
 "In respect to the relevancy of evidence, the general rule is, that it must be confined to the points in issue, and no circumstance is admissible, which does not tend to establish a fact material to the prosecution or defense, or from which no presumption or inference can be reasonably drawn in reference to a material fact or inquiry involved in the issue. It is often difficult to determine when a fact or circumstance is too remote to aid the jury in arriving at a conclusion on the issues to be tried. But it may be said generally, that all parts of one continuous transaction, though not shown to have any immediate connection with the offense — the culmination of all the circumstances — and facts, proximate to the consumation of the crime, which tend to shed light on the main inquiry, are admissible."
In Jordan the court held that under an indictment for murder, it being shown that the homicide was committed at a house where all the parties, with others, were engaged in a frolic where there was dancing and drinking, all the occurrences of the evening may be regarded as constituting one continuous transaction, and are admissible in evidence.
The killing in the instant case was the culmination of a series of acts and circumstances beginning in the early evening and ending several hours later with the unfortunate death of Mr. McGuire. The chain of events began around 9:00 P.M. when appellant was observed near the bridge by some of the fishermen, blocking the highway with his vehicle, and urinating in public. During the next three to four hours, appellant engaged, off and on, in conduct which was obviously designed and intended to vex, harass, and be offensive to the group of fishermen on the bridge. This conduct included throwing a dog off the bridge, initiating a fight, using profanity, public drinking, interfering with the fishermen, making threats, and general rowdiness. Appellant's activities, along with those of his companions, especially Billy Crowe, displayed a hostile and menacing attitude toward the group of fishermen that included the deceased. In the beginning the offensive, menacing, and threatening conduct seemed to be directed toward the entire group of fishermen, but as the evening wore on, appellant and Billy Crowe seemed to more and more concentrate their activities toward the deceased. During the entire ordeal, the group of fishermen including the deceased displayed commendable restraint in avoiding open confrontation with appellant and Billy Crowe. It obviously was not easy. The jury was fully justified in concluding from the actions of appellant and his companion, Billy Crowe, that being well fortified with alcohol, they were spoiling for a fight. The jury could have reasonably concluded that their conduct was calculated to provoke someone, anyone, in the group of fishermen to stand up to them in order to satisfy their desire to engage in a brawl. The conduct of appellant referred to above, including publicly urinating on the highway and throwing the dog off the bridge, definitely tends to throw light upon and explain his state of mind, disposition, actions, motive, animus, and mental attitude at the time of the fatal difficulty. In view of his defense that he was grabbing the deceased in order to protect him from the knife being wielded by Billy Crowe, his antecedent conduct bears upon the question of freedom from fault and whether he was an *Page 1137 
aider and abettor in the commission of the crime. The intent and disposition with which one does a particular act must be ascertained from his acts and declarations before and at the time.
In the case sub judice the incidents objected to by appellant were sufficiently near to the time of the commission of the offense to justify the inference that the appellant had a settled purpose in regard to it. It could be reasonably inferred from his conduct that his settled purpose was to provoke an altercation with anybody in the group of fishermen. Any reasonable person would have to conclude that appellant's conduct under the circumstances was likely to bring on an altercation. It could reasonably be inferred that it continued to be his purpose from the beginning and up to the fatal difficulty. It also could be reasonably concluded that the passion in appellant to engage in a brawl continued unabated from the earliest incident to the final difficulty.
Here, the incidents complained of, while not strictly speaking a part of the res gestae, tend to explain and relate to the killing, and are a part of one continuous transaction. The chain of events need not be a part of the res gestae in the sense that these events became a part of the crime itself, since they led up to and tend to explain the acts, animus, or intent of appellant at the time of the killing of Mr. McGuire.
The rulings of the trial court on the admission of the evidence of appellant's urinating on the highway and throwing the dog from the bridge were free from prejudicial error.
 II
Appellant's second contention of error is that the trial court erroneously permitted the prosecuting attorney to question appellant on cross-examination about a fight he and Billy Crowe may have had with a third party, Thornton, several months prior to the homicide. Appellant had testified that he knew Billy Crowe, but that they were not "good friends." He also testified that he had only known Billy Crowe for a few months and that he had never been "off" with Crowe before the night of the killing. Appellant's wife testified that she was not well acquainted with Billy Crowe, that her husband had not "run" with Crowe, and that she had never known her husband to be with Crowe at all. She also testified that Billy Crowe had come to her house approximately one month prior to the murder. The defense was trying to establish by this testimony that appellant and Billy Crowe were mere acquaintances and did not run around together. The obvious purpose of the testimony was to refute the implication that appellant was aiding and abetting Billy Crowe in the assault on McGuire, and to bolster his testimony that his intervention was for the purpose of saving McGuire from harm. The State, by its cross-examination was attempting to rebut this testimony by showing that the two men in fact "ran around" together prior to the murder and had previously engaged in affrays together. The State contends that it had a right to cross-examine appellant concerning his prior relationship and activities with Billy Crowe. We agree.
The privilege of cross-examination inures to the benefit of the State in a criminal prosecution just as to any other party.Bickerstaff v. State, 369 So.2d 315 (Ala.Crim.App. 1979). The scope and extent of such are matters addressed to the sound discretion of the trial court, whose ruling will not be disturbed absent a showing of gross abuse or substantial injury. Trawick v. State, 431 So.2d 574 (Ala.Crim.App. 1983);McFerrin v. State, 339 So.2d 127 (Ala.Crim.App. 1976); Robertsv. State, 338 So.2d 466 (Ala.Crim.App. 1976); Ala. Code 1975, §12-21-137.
The general rule as to the right of the State to cross-examine the defendant if he takes the stand, and the authorized scope of the examination, is stated in 81 Am.Jur.2d, Witnesses, § 495 (1976), as follows:
 "When a defendant takes the stand and testifies on his own behalf, the prosecution has the right to cross-examine him with the same latitude as any other *Page 1138 
witness. The prosecution has the right to cross-examine him on his evidence in chief with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the crime. Within the limits of appropriate rules, he may be cross-examined as to the facts in issue, and may be examined for the purpose of impeaching his credibility."
The general rule as to the discretion of the trial court in limiting the scope and extent of cross-examination is stated in 81 Am.Jur.2d, Witnesses, § 472 (1976), as follows:
 "In both civil and criminal cases, the scope and extent of cross-examination with respect to an appropriate subject of inquiry rests in the sound discretion of the trial court, and it is only in the case of clear abuse of such discretion, demonstrably prejudicial to the complaining party, that a reviewing court will interfere."
In the instant case the appellant first injected into evidence testimony that he was not well acquainted with Billy Crowe and had not been out with him prior to the night of the murder. On cross-examination the State was properly allowed to question appellant about his past relationship with Billy Crowe and to probe into that relationship if one existed. The purpose of such cross-examination was to impeach the credibility of appellant and rebut his testimony. The defense, by initially putting this matter into evidence, opened the door for the State to rebut such evidence if it could. The trial court was not in error in overruling appellant's objection to such cross-examination. It should be noted that the appellant did not testify on cross-examination to any prior involvement or associations with Billy Crowe. He stated that he did not remember any.
In answer to the question concerning a fight with a person named Thornton, he admitted that he had observed a fight between Billy Crowe's brother, John Crowe, and Thornton at a filling station some time prior to the night of the killing. Thus, since the answer to the question was not unfavorable to appellant, and showed that the appellant and Billy Crowe were not involved in the fight with Thornton, any prejudicial effect which the question may have had was removed. Coleman v. State,452 So.2d 1355 (Ala.Crim.App. 1984). There is no error here, but, arguendo, if there was error, it was not such as to probably injuriously affect any substantial rights of appellant. A.R.A.P. 45.
 III
Lastly, appellant contends that the trial court committed error when it sustained the State's objections to a statement made by defense counsel during closing argument. The statement was that the appellant was "living with his wife and family supporting them." The prosecuting attorney objected on the grounds that there had been no evidence introduced that appellant was supporting his family. The record discloses that there was testimony from appellant that he was living with his wife, but there was no testimony that he was supporting his wife and children. Appellant apparently contends in his brief that because he owned his own home, had been employed for several years, and was raising two stepchildren along with his own, constituted a sufficient factual basis from which to infer that he was supporting his family for purposes of argument to the jury. The record does not disclose any evidence that he owned his own home. The appellant argues in his brief that the purpose of the prosecuting attorney's objection to the argument was to imply and lead the jury to believe that he was a "deadbeat." He further argues that by sustaining the prosecutor's objection to the argument, the trial court approved the characterization of appellant as a "deadbeat" and thereby erroneously commented on the evidence. He further alleges that the prosecution attempted all through the trial to portray appellant as a person of bad character, amoral, subhuman, a perpetrator of grisly acts, a tasteless scofflaw, and an abuser of animals. He states in his brief that the *Page 1139 
trial judge acquiesced in this alleged portrayal by the prosecuting attorney.
In the matter of an attorney's argument to the jury, much must be left to the enlightened judgment of the trial court, with presumptions in favor of its rulings. Ott v. Fox,362 So.2d 836 (Ala. 1978); S.S. Kresge Co. v. Ruby, 348 So.2d 484
(Ala. 1977); Adams v. State, 291 Ala. 224, 279 So.2d 488
(1973). To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted. Robins Engineering, Inc. v. Cockrell,354 So.2d 1 (Ala. 1977); Walker v. Cardwell, 348 So.2d 1049
(Ala. 1977); Adams v. State, supra; Freeman v. Hall, 286 Ala. 161, 238 So.2d 330 (1970); St. Clair County v. Martin, 273 Ala. 302, 139 So.2d 617 (1962).
In argument to the jury, counsel may not argue as a fact that which is not in evidence, but he may state or comment on all proper inferences from the evidence and may draw conclusions from the evidence based on his own reasoning. McLaney v.Turner, 267 Ala. 588, 104 So.2d 315 (1958); Adams v. State, supra. There clearly was no direct evidence introduced that appellant was supporting his family, and in this regard appellant's attorney was arguing a fact not in evidence. It could be argued that testimony that appellant was employed, living with his wife, and raising his children, would logically support an inference that he was supporting his family, and therefore be legitimate argument for the jury. We have examined the argument objected to in the light of the legal principles involved, and we are unable to conclude that prejudicial error was committed by the trial court. We believe that the ruling of the trial court was within the bounds of its discretion, and no substantial prejudice to the appellant resulted from it.
We find that the allegations of appellant that the prosecuting attorney engaged in a planned attempt at character assassination in order to obtain a conviction, regardless of the evidence, is unsupported in the record. Likewise, the allegations that the trial court acquiesced and joined in such alleged conduct or erroneously commented on the evidence in that regard are without foundation or support in the record.
In the case sub judice appellant does not question the sufficiency of the evidence; however, we find that sufficient facts were shown from which the jury could reasonably infer that the offense of manslaughter had been committed, therefore, the question was properly submitted to the jury. Allen v.State, 380 So.2d 313 (Ala.Crim.App.), cert. denied,380 So.2d 341 (Ala. 1980), cert. denied, 449 U.S. 842, 101 S.Ct. 121,66 L.Ed.2d 49 (1980); Hill v. State, 207 Ala. 444, 93 So. 460
(1922). The weight and probative value of the evidence was for the jury to determine. Allen v. State, supra; Baldwin v. State,342 So.2d 940 (Ala.Crim.App. 1977), and authorities cited therein. Appellant's testimony was in direct conflict with the testimony of the State's witnesses. The jury resolved the issue against the appellant, and we think that the verdict was properly sustained by the State's evidence.
We have considered the entire record with great care and find no error therein. The judgment of the lower court must be affirmed.
AFFIRMED.
All Judges concur.