[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1113 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1114 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1115 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1116 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1117 
The appellant, Mario Centobie, was charged with capital murder for intentionally causing the death of Officer Keith Turner, a police officer, while he was on duty, see § 13A-5-40(a)(5), Ala. Code 1975. On the appellant's motion for a change of venue, venue was changed from St. Clair *Page 1118 
County to Elmore County. After testifying in his own behalf and admitting to having committed all of the elements of the charged offense, the appellant was found guilty as charged. Following a sentencing hearing, the jury returned an advisory verdict recommending death by electrocution. The final sentencing hearing was held before the trial court, which accepted the jury's recommendation and sentenced the appellant to death by electrocution.
On appeal from his conviction, the appellant raises 17 issues, many of which he did not raise by timely objection in the trial court. Because the appellant was sentenced to death, his failure to object at trial does not bar this Court's review of these issues; however, it does weigh against any claim of prejudice he now raises on appeal. See Whitehead v.State, 777 So.2d 781 (Ala.Crim.App. 1999); Dill v. State, 600 So.2d 343
(Ala.Crim.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied,507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State,577 So.2d 474 (Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886 (1991).
Rule 45A, Ala.R.App.P., provides:
 "In all cases in which the death penalty has been imposed, the Court of Criminal appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
This court has recognized that "`the plain error exception to the contemporaneous objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Whitehead v. State, supra, at 794, quoting Burton v. State,651 So.2d 641, 645 (Ala.Crim.App. 1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115 (1995).
A summary of the facts surrounding this offense is set out in the trial court's sentencing order and findings of fact, issued pursuant to §13A-5-47(d), Ala. Code 1975. That order states, as follows:
 "On the 25th day of June, 1998, Sheriff Maurice Hooks of Jones County Mississippi and an assistant, Ray Butler, were transporting Mario Centobie and Jeremy Granberry from Parchman Prison to court hearings in Jones County. In the small town of Richland, Mississippi, Hooks stopped to allow the inmates to use the restroom and Hooks and Butler were overpowered by the two inmates. Centobie pulled Hooks's Ruger .45 automatic pistol from his holster and forced Hooks and Butler at gunpoint to an isolated area where they were both left tied to poles. Centobie kept Hooks's .45 Ruger as he and Granberry fled the area in Hooks's marked sheriff's car, which coincidentally, was without a rear bumper due to an earlier accident involving Sheriff Hooks.
 "Several hours later in the evening hours of June 25th Capt. Cecil Lancaster of the Tuscaloosa Police Department was returning home after attending a meeting after work. He noticed Hooks's marked patrol car being driven by two individuals proceeding on I-359. The fact that the marked vehicle had no bumper or tag attracted Lancaster's attention. As the vehicle passed, Lancaster's suspicions were further raised by the fact that neither occupant of the vehicle acknowledged him. Lancaster pulled the vehicle over. As he approached the vehicle shots were fired by one of the occupants from within the *Page 1119 
vehicle through the back driver's side window striking Lancaster twice. The bullets fired into Lancaster were consistent with having been fired from the .45 Ruger belonging to Sheriff Hooks. While Lancaster lay on the ground, after being shot, the vehicle began to back up as if to run over him. He managed to fire shots into the rear window of the vehicle, which then immediately fled the scene.
 "After shooting Officer Lancaster, Centobie and Granberry then abandoned the Sheriff's patrol vehicle and stole a 1981 Mercury vehicle belonging to Brandon Blake from Marguerite's Lounge in Tuscaloosa.
 "On June 27th, at about 10:30 P.M. Lori Mullins, working Central Dispatch and 911, received a radio transmission from Officer Keith Turner who was on duty in a marked Moody patrol car, that Turner had stopped a vehicle. Inside Blake's stolen vehicle Centobie told his companion Granberry `I ain't going back to Parchman.' As Centobie exited the vehicle he placed the .45 against the back of the front seat and left the door open. Centobie approached Turner. After Turner asked Centobie, `Hey, what are y'all doing?' Centobie returned to the front seat of the vehicle under the guise of getting his license and registration. Turner continued to approach the vehicle and when he was next to Centobie and the vehicle, Granberry jumped from the vehicle. Centobie pulled the .45 and shot Turner three times. One shot lodged in Turner's vest, one shot hit Turner in the hip area, and a third shot was fired directly into the back of Turner's head. Turner's death was immediately caused by the fatal shot to the back of the head.
 "After fleeing the area of the shooting, Centobie avoided an extensive manhunt for several days. On July 4th, Centobie kidnapped Daniel Alexander in the parking lot of a small store at about 9:30 P.M. in order to effect his escape from the Moody area. After kidnapping Alexander, Centobie forced him to drive to Mobile. Alexander escaped from Centobie at a rest area near the Alabama-Mississippi state line west of Mobile and alerted law enforcement to Centobie's presence in the area. Centobie was finally captured by Mississippi authorities on July 5, 1998. Lt. Obie Wells found Centobie riding in a van on I-10 near Biloxi. At the time of his capture, Centobie was still armed with Sheriff Hooks's .45 Ruger."
 I.
The appellant argues that his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution were violated by the trial court's admission into evidence of his confession, made following his capture in Pascagoula, Mississippi. Specifically, he alleges that his confession was obtained through custodial interrogation, and that before the interrogation, he had requested and been denied an attorney. The appellant further argues that the erroneous admission of his confession, which he says was not voluntary and knowing, prejudiced him at trial. In support of his argument, the appellant relies on the court reporter's transcription, recorded during the suppression hearing, which, he argues, indicates that he had requested an attorney before his interrogation and subsequent confession. Specifically, he alleges that the following excerpt based on the transcription of the audiotape made by Agent Borghini, indicates that he had requested an attorney:
 "[Agent Borghini]: And you wish to stop answering questions and request a lawyer? *Page 1120 
"[Centobie]: (Inaudible response.)"
This Court has stated:
 "It has long been the law that a confession is prima facie involuntary and inadmissible, and that before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a Miranda predicate. Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App. 1990). A two-pronged test is used to determine whether an accused's statement is admissible. First, the trial court must determine whether the accused was informed of his Miranda
rights. Second, the trial court must determine whether the accused voluntarily and knowingly waived his Miranda rights before making his statement. Holder v. State, 584 So.2d 872, 878 (Ala.Crim.App. 1991); Carpenter v. State, 581 So.2d 1277, 1278
(Ala.Crim.App. 1991)."
Wigfall v. State, 710 So.2d 931, 934-35 (Ala.Crim.App. 1997).
At the suppression hearing, Investigator Michael Manlief, an Alabama State Trooper assigned to the criminal investigative division of the Alabama Bureau of Investigation, testified that he and Federal Bureau of Investigation ("FBI") Agent Lawrence Borghini, along with FBI Special Agent Ricky Maxell and Jackson County Sheriff's Deputy Rob Carew, had interviewed the appellant on July 5, 1998, in a Pascagoula, Mississippi, jail. Investigator Manlief stated that an audiotape was made of the appellant's interrogation; the interrogation lasted approximately four hours. He testified that the tape was originally inserted in the wrong direction, and that by the time the error was corrected and the tape had been restarted (approximately 15 seconds), Agent Borghini and the appellant were in the middle of the Miranda warnings. Cf. Smith v. State,756 So.2d 892, 931 (Ala.Crim.App. 1997) (The officer's failure to record that portion of the interrogation when he advised the appellant of hisMiranda rights would not render the statement inadmissible. Rather, it would be taken into consideration by the jury in determining the weight and credibility to assign to the officer's testimony regarding the appellant's confession.). Investigator Manlief testified that Agent Borghini informed the appellant of his Miranda rights and that the appellant indicated that he understood his rights and agreed to speak to them. He further testified that the appellant knowingly and voluntarily signed a waiver of rights form. He testified that the appellant was not threatened, coerced, or promised anything in return for his statement. Investigator Manlief testified that the appellant indicated that he did not wish to have an attorney present. After ascertaining that neither the State nor defense counsel intended to offer the audiotape or a transcript of the tape into evidence, the trial court found that, based on the testimony at the suppression hearing, the appellant's statement had been voluntarily given of his own free will, with a knowing waiver of his right to remain silent. See Jackson v. State, 516 So.2d 726, 741
(Ala.Crim.App. 1985) ("The trial judge need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made.").
A review of the audiotape of the appellant's interrogation indicates that the question asked by Agent Borghini was "And [do] you wish to stop answering questions and request a lawyer?" The appellant's response was non-verbal. The next statement Agent Borghini made was "You have the right to stop answering questions." The appellant openly acknowledged to the officers that he did not want an attorney present and that he would talk with them, but that he wanted *Page 1121 
the right to refuse to answer certain questions. That request was granted. Cf. Smith v. State, supra, at 932. The defendant did not clearly and unequivocally invoke his Miranda rights or his constitutional right to remain silent by stating that he did not want to tell an interviewing officer who had altered the gun used in the shooting. The officer was justified in questioning the defendant further regarding the alteration; moreover, the defendant did not request to have an attorney present before he answered the question. A review of the entire tape indicates the appellant's willingness to discuss the case with law-enforcement officials. Based on the foregoing, the trial court was correct in finding that the appellant knowingly and voluntarily gave a statement.
 II.
The appellant argues that it was error for the trial court to permit Brandi Turner, the victim's wife, to testify concerning incriminating statements the appellant made to her while he was awaiting trial. More particularly, he argues that Mrs. Turner's testimony disclosing the contents of his conversation with her violated his Fifth Amendment privilege against self-incrimination, his Sixth Amendment right to counsel, and the protections afforded by Miranda v. Arizona, 384 U.S. 436
(1966).
 "`Miranda warnings are not required in instances where inculpatory or otherwise admissible statements are made to persons who are not law enforcement officers or their agents. Hinshaw v. State, 398 So.2d 762
(Ala.Crim.App. 1981), writ denied, 398 So.2d 766
(Ala. 1981); Truex v. State, 282 Ala. 191, 210 So.2d 424
(1968); Ellis v. State, 338 So.2d 428 (Ala.Crim.App. 1976); Bedingfield v. State, 47 Ala. App. 677, 260 So.2d 408 (1972).' Warrick v. State, 460 So.2d 320
(Ala.Cr.App. 1984). See also State v. McDevitt, 484 So.2d 543, 547 (Ala.Cr.App. 1985). Miranda does not apply when the inculpatory statement is made to a private citizen, but only to the custodial interrogation of a suspect by the police. Traylor v. State, 439 So.2d 178, 180-81 (Ala.Cr.App. 1983)."
Rankin v. State, 541 So.2d 577, 579 (Ala.Crim.App. 1988).
To succeed on any of his claims, the appellant must establish that Brandi Turner was acting as an agent of the State of Alabama. In determining whether Mrs. Turner was acting as an agent of the police department, "we must look to the circumstances surrounding the giving of the confession." Woodson v. State, 392 So.2d 551, 552-53 (Ala.Crim.App. 1980), cert. denied, 392 So.2d 554 (Ala. 1981). The record contains no evidence that Brandi Turner was, in fact, acting as an agent of the State. The record indicates that on the day the appellant was returned to the Etowah County jail following his capture after the murder of Officer Turner, the victim's widow, Brandi Turner, was at the sheriff's department searching for information concerning her husband's death. She was unaware that the appellant was being returned that particular day. After being informed that the appellant was at the jail, Mrs. Turner requested and was granted permission to speak with him. Although she was escorted to the appellant's cell by law-enforcement officers, she was left alone with the appellant after he requested that the officers leave. Evidence was presented indicating that the appellant initiated the conversation with Mrs. Turner, asking if she was Brandi Turner. The only question Brandi Turner asked in the presence of the law-enforcement officials was "Why?" The appellant sent the law-enforcement personnel away and answered her question. Mrs. Turner did not inform *Page 1122 
the authorities of the content of their conversation until several days later. At that time, she told them that when she asked the appellant, "Why did you murder my husband?" the appellant replied that he did not murder Officer Turner, he merely shot him. Upon further questioning, the appellant informed Mrs. Turner that he shot Officer Turner in the head because "he had to."
The appellant cites Peoples v. State, 615 So.2d 1265 (Ala.Crim.App. 1992), in support of his argument that Brandi Turner was acting as an agent for the State when he spoke with her. In Peoples, this Court reversed the trial court's judgment based on a finding that the police presence at Peoples's confession to someone who is not an agent did not constitute error. However, the facts of Peoples are clearly distinguishable. In that case, K-mart employees were questioning the appellant extensively, in the presence of a police officer who had just arrested her companion, as to her culpability concerning her possession of store merchandise. Although he initially did little of the questioning, he became more involved after she confessed. In holding that the police presence was significant, this Court in Peoples noted that the police officer was present during the entire interrogation and that the surroundings emphasized that officer's presence. This Court further concluded, in addition to believing that the defendant was answering a private citizen's question, the appellant could have reasonably believed that she was answering the police, as well.
In the present case, Brandi Turner was acting as a private citizen when she spoke with the appellant. There was no indication that Brandi Turner was speaking to the appellant as part of an arrangement with law-enforcement authorities. Although the police escorted her to the appellant, he said nothing until the officers left at his insistence. Additionally, the record does not indicate that Mrs. Turner or the authorities made any threats, promises, or inducements to the appellant in exchange for his statement to her. "In the Miranda case the Court defined interrogation as `question initiated by law enforcement officers.' Because of this and also because of the general doctrine that State action is a prerequisite to application of constitutional protections, it is clear that Miranda does not govern interrogation by private citizens acting on their own." LaFave and Israel, CriminalProcedure, § 6.10(b) (1984) (footnotes omitted). See also Annot., 31 A.L.R.3d 565 at 671 (1970). Rankin v. State, supra, at 580. Moreover, since the appellant gave testimony concerning the conversation at trial, any error would have been harmless. Rule 45, Ala.R.App.P.
 III.
The appellant argues that the trial court committed reversible error in admitting evidence regarding his second escape from custody; that escape occurred while he was awaiting trial for the murder of Officer Turner. Specifically, the appellant contends that "flight evidence" does not include an escape from jail following arrest to avoid prosecution for a charged crime, and, therefore, that the prejudicial effect of the evidence of escape substantially outweighed its probative value. Additionally, the appellant argues that his earlier escape from Parchman Prison in Mississippi, following his conviction in Mississippi, makes it unreasonable to now argue that he escaped from custody in Alabama out of a consciousness of guilt.
The appellant's argument regarding evidence of flight directly conflicts with this Court's decision in Minor v. State, *Page 1123 780 So.2d 707, 767 (Ala.Crim.App. 1999). That case states:
 "`The trial court may exclude relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice. Spellman v. State, 473 So.2d 618 (Ala.Cr.App. 1985); C. Gamble, McElroy's Alabama Evidence, § 21.01(4) (4th ed. 1991). Whether such evidence should be excluded because of its prejudicial nature is largely within the discretion of the trial court, and its determination in that regard will not be disturbed absent a clear showing of abuse. Spellman v. State; Ward v. State, 440 So.2d 1227 (Ala.Cr.App. 1983).'
 "Graves lv. State, 632 So.2d 30, 31 (Ala.Cr.App. 1992), aff'd in pertinent part, 632 So.2d 33 (Ala. 1993).
 "`"In a criminal prosecution the state may prove that the accused engaged in flight to avoid prosecution. This principle is based upon the theory that such is admissible as tending to show the accused's consciousness of guilt. The flight of the accused is admissible whether it occurred before or after his arrest.
 "`"The state is generally given wide latitude or freedom in proving things that occurred during the accused's flight. This is especially true of those acts of the accused which tend to show that the flight was impelled by his consciousness of guilt.
 "`C. Gamble, McElroy's Alabama Evidence § 190.01(1) (4th ed. 1991) (citations omitted). See also 2 Wigmore, Evidence § 276(4) (Chadbourn rev. 1979); Chandler v. State, 555 So.2d 1138
(Ala.Cr.App. 1989).'
 "Sartin v. State, 615 So.2d [135], 137 (Ala.Cr.App. 1992). (Emphasis added); C. Gamble, McElroy's Alabama Evidence, § 190.01 (5th ed. 1996); and DeSilvey v. State, 245 Ala. 163, 16 So.2d 183 (1943)."
The record indicates that three months after being taken into custody for the murder of Officer Turner, the appellant escaped from the Etowah County jail. He was captured in DeKalb County, Georgia. During the trial proceedings, the trial court instructed the State not to refer to the flight as a separate offense. The trial court further stated that it intended to charge the jury on flight as circumstantial evidence in the case, rather than as evidence of a separate offense. Subsequently, the trial court gave the following jury instruction:
 "In this case, evidence has been introduced indicating that the defendant escaped after being charged and confined for this offense. Now escape from a confinement or other evasions or attempts to evade justice by a person charged with a crime is circumstantial evidence from which the jury may infer a consciousness of guilt on the part of the defendant. The weight to which such evidence is entitled is up to you ladies and gentlemen of the jury. It is within your province to determine what weight you will give this evidence of escape or flight. You, the jury, may consider evidence of other factors or reasons which may have caused the flight or escape of the defendant in making your decision whether the flight or escape of the defendant in this case was a result of his consciousness of guilt of the offense charged."
The trial court did not err in admitting evidence of the appellant's escape from the Etowah County jail. The testimony at trial was limited to the facts surrounding his escape from jail, which occurred approximately three months after the murder of Officer Turner. The trial *Page 1124 
court did not allow testimony about the appellant's subsequent indictment for escape. Moreover, the record indicates that the trial court's instruction did not create, as the appellant argues, an impermissible inference that the only reasonable conclusion to be formed from the appellant's escape was that it was an attempt to avoid prosecution, but rather, as possible circumstantial evidence of consciousness of guilt. The trial court did not abuse its discretion. Ex parte Clark,728 So.2d 1126, 1136-37 (Ala. 1998).
 IV.
The appellant argues that the trial court erred in admitting evidence of his actions from the time he escaped from Sheriff Hooks's custody in Mississippi until he was taken into custody on July 5, 1998. More particularly, he argues that the trial court erred in admitting evidence of uncharged collateral robberies because, he says, these offenses bore no relevance to the charged crime, were highly prejudicial, and did not fall under any of the recognized exceptions to Rule 404(b), Ala.R.Evid. Additionally, he argues that the trial court failed to state on the record the specific Rule 404(b) exception under which it was admitting evidence of other crimes at trial. Lastly, the appellant argues that the admission of such evidence, without a limiting instruction from the trial court, prejudiced him and denied him a fair trial.
The record indicates that on September 29, 1998, the State filed notice of its intention to offer "other crimes" evidence pursuant to Rule 404(b), Ala.R.Evid. The evidence consisted of: (1) the assault, robbery, and kidnapping of Sheriff Maurice Hooks and Ray Butler that occurred on June 25, 1998, in Rankin County, Mississippi, as well as the appellant's and Jeremy Granberry's escape from custody; (2) the attempted murder of Capt. Cecil Lancaster of the Tuscaloosa Police Department on June 25, 1998, as well as the theft of an automobile from Tuscaloosa, which was later found in Moody, Alabama; and (3) the kidnapping of Daniel Alexander from St. Clair County on July 4, 1998, in furtherance of the appellant's escape from St. Clair County to avoid prosecution. In its notice, the State argued that it intended to offer the acts "to show identity, motive, opportunity, intent, preparation, plan, knowledge, and flight by the defendant to avoid prosecution."
The appellant takes issue with the fact that the State was allowed to offer into evidence, through the testimony of Investigator Manlief, evidence suggesting that the appellant committed several uncharged burglaries while he was "within the perimeter of the manhunt." Investigator Manlief testified that the appellant gave a statement to him and that in the statement he admitted to breaking into several houses within the perimeter of the manhunt and stealing food from the back of the refrigerators in those houses where it would not be missed.
The record reveals, however, that prior to Investigator Manlief's testimony regarding the uncharged crimes, or "bad acts," the trial court conducted a bench conference in response to defense counsel's objection to the admission of the evidence. The trial court held that anything unrelated to Officer Turner's shooting must be kept out of the trial, but allowed Investigator Manlief's testimony, stating that "it [was] part of this action, dealing with the escape from Sheriff Hooks through Tuscaloosa through the incident dealing with Mr. Alexander, all that is part of this same transaction, and can be used."
 "`On the trial for the alleged commission of a particular crime, evidence of the accused's having committed another *Page 1125 
act or crime is not admissible if the only probative function of such evidence is to prove bad character and the accused's conformity therewith. This is a general exclusionary rule which prevents the introduction of prior acts or crimes for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question. . . .
"`. . . .
 "`The foregoing exclusionary rule does not work to exclude evidence of all crimes or acts, only such as are offered to show the defendant's bad character and conformity therewith on the occasion of the now-charged crime. If the defendant's commission of another crime or misdeed is relevant for some other material purpose in the case then it may be admitted."
 "Charles W. Gamble, McElroy's Alabama Evidence, § 69.01(1) at 300-01 (5th ed. 1996) (footnotes omitted).
 "`[E]vidence of collateral offenses may be admissible under certain exceptions to the exclusionary rule or for "other purposes" than to prove the accused's guilt.' Williamson v. State, 629 So.2d 777, 780 (Ala.Cr.App. 1993). In Nicks v. State, 521 So.2d 1018 (Ala.Cr.App. 1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), this court discussed the exceptions to the general exclusionary rule:
 "`Numerous Alabama cases list the exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted. These exceptions include the following:
 "`"(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes."
 "`Nelson v. State, 511 So.2d 225, 233 (Ala.Cr.App. 1986). See also Twilley v. State, 472 So.2d 1130
(Ala.Cr.App. 1985); Brewer v. State, [440 So.2d 1155
(Ala.Cr.App.), cert. denied, 440 So.2d 1155
(1983)]; Miller v. State, 405 So.2d 41 (Ala.Cr.App. 1981); Thompson v. State, 374 So.2d 377
(Ala.Cr.App. 1978), aff'd, 374 So.2d 388 (Ala. 1979); McMurtrey v. State, 37 Ala. App. 656, 74 So.2d 528 (1954); Wilkins v. State, 29 Ala. App. 349, 197 So. 75, cert. denied, 240 Ala. 52, 197 So. 81
(1940); [Charles W. Gamble,] McElroy's [Alabama Evidence] §§ 69.01(1-11) [(3d Ed. 1977)]; Schroeder, Evidentiary Use in Criminal Cases of Collateral crimes and Acts: A Comparison of the Federal Rules and Alabama Law, 35 Ala.L.Rev. 241 (1984). All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); Noble v. State, 253 Ala. 519, 45 So.2d 857 (1950).
 "`"All evidence is relevant which throws, or tends to throw, any light upon the guilt or the innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove, that *Page 1126 
at some other time or at the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime, or may establish some collateral and unrelated fact. Evidence of other acts to be available must have some logical connection and reveal evidence of knowledge, design, plan, scheme, or conspiracy of the crime charged; or circumstantial evidence of identity of the person charged with the crime; or tends to corroborate direct evidence admitted."
 "`Underhill, Criminal Evidence § 154 (3d ed. 1923).'
 "521 So.2d at 1025-26. `"The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State's case-in-chief rests within the sound discretion of the trial judge." Akin v. State, 698 So.2d 228, 234 (Ala.Cr.App. 1996), cert. denied, 698 So.2d 238 (Ala. 1997), quoting Blanco v. State, 515 So.2d 115, 120 (Ala.Cr.App. 1987).'"
Perkins v. State, [Ms. CR-93-1931, November 19, 1999], 808 So.2d 1041
(Ala.Crim.App. 1999), affirmed, [No. 1991016, March 30, 2001]808 So.2d 1143 (Ala. 2001).
In Bradley v. State, 577 So.2d 541, 547-48 (Ala.Crim.App. 1990), this Court stated:
 "[E]ven though evidence of collateral crimes or acts may be relevant to an issue other than the defendant's character, it should be excluded if `it would serve comparatively little or no purpose except to arouse the passion, prejudice, or sympathy of the jury.' Spellman v. State, 473 So.2d 618, 621 (Ala.Cr.App. 1985), or put another way, `unless its probative value is "substantially outweighed by its undue prejudice."' United States v. Stubbins, 877 F.2d 42, 43 (11th Cir.), cert. denied, 493 U.S. 940, 110 S.Ct. 340, 107 L.Ed.2d 328 (1989) (quoting United States v. Beechum, 582 F.2d 898 (5th Cir. 1978) (en banc, cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).)
". . . .
 "Rather than uphold the trial court by straining to neatly fit the evidence of the three prior incidents into the narrow confines of the traditionally recognized categories, we have chosen to review the court's ruling by determining whether the evidence was `material and logically relevant' to an issue or issues in the case."
In this case, the evidence of the uncharged crimes was material and logically relevant to show that all of the criminal acts committed by the appellant were part of one continuous criminal adventure. In Davis v.State, 740 So.2d 1115 (Ala.Crim.App. 1998), aff'd, 740 So.2d 1135 (Ala. 1999), this Court stated the following regarding the continuous-transaction exception to the exclusionary rule:
 "In Rowell v. State, 570 So.2d 848 (Ala.Cr.App. 1990), we held that evidence of uncharged crimes may properly be admitted under the following circumstances:
 "`"Evidence of the accused's commission of another crime is admissible if such other crime is inseparably connected with or is a part of the res gestae of the now-charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence." C. Gamble, McElroy's Alabama Evidence (3d ed. 1977), § 69.01(3). See also Orr v. State, 462 So.2d 1013, 1015 (Ala.Cr.App. *Page 1127 
1984). "Evidence of other crimes is properly admissible as part of the res gestae if all of the criminal acts are part of one continuous criminal adventure by the same party occurring within a matter of hours."'"
740 So.2d at 1130.
Here, it was not error to admit evidence, through the testimony of Investigator Manlief, of other uncharged criminal acts by the appellant because they were a part of a continuous criminal adventure by the same parties. Therefore, the trial court did not abuse its discretion in admitting this evidence.
 V.
The appellant argues that he was denied a fair trial because "numerous additional" law-enforcement officers were present in the courtroom during his trial. The appellant argues that the State's interest in maintaining numerous officers around the courtroom for security purposes was slight, in comparison to the highly prejudicial effect of their presence.
The record indicates that the appellant made an oral motion at trial "to not have so many officers standing in here. . . . They are all standing along the wall and that is highly prejudicial." In response to the motion, the trial court ordered the officers standing along the wall to be seated. Because the record is silent as to the exact number of officers in the courtroom, and because the trial court granted the appellant's motion, his argument is subject to plain-error review. See Rule 45A, Ala.R.App.P.
This Court has written in Goodwin v. State, 495 So.2d 731, 733
(Ala.Crim.App. 1986):
 "The degree of restraint necessary has historically and wisely been left to the discretion of the trial court. Faire v. State, 58 Ala. 74 (1877); Martin v. State, 51 Ala. App. 405, 286 So.2d 80 (1973).
". . . .
 "It is not necessary that there be a formal record of a certain type of misconduct to justify the posting of armed guards. Within constitutional limits, great weight must be accorded the discretion of the trial court. The trial judge is responsible for maintaining order in his courtroom. He understands infinitely better than we what is necessary to perform his duty."
Considering the fact that the appellant was charged with the capital offense of killing a police officer, along with overpowering, kidnapping, and beating two law-enforcement officers and shooting a third officer, we conclude that allowing an "additional" number of law-enforcement officers to be seated in the courtroom was not an abuse of the trial court's discretion. No plain error occurred in this regard.
 VI.
The appellant argues that the trial court committed reversible error in allowing the State, during the sentencing phase, to use a trial aid listing all eight statutory aggravating factors enumerated in §13A-5-49, Ala. Code 1975. For the first time, on appeal, he argues that the prosecutor's comment in his opening statement to the jury, during the sentencing phase, that evidence would be presented as to "at least" four of the aggravating circumstances violated the trial court's restriction on the use of the trial aid, and was an attempt to mislead the jurors into considering more than four aggravating circumstances. Because the appellant failed to raise this specific objection at trial, it is subject to plain-error review. Barnes v. State, 727 So.2d 839 (Ala.Crim.App. 1997); Rule 45A, Ala.R.App.P. *Page 1128 
The record reveals that before the sentencing phase of the appellant's trial, the following colloquy occurred between defense counsel, the prosecutor, and the trial court:
 "[Defense counsel]: This is a matter that has not been brought to the Court's attention. I do see that some trial aids that have been prepared by the District Attorney's Office that lists — one exhibit appears to list the statutory or mitigating circumstances, and the other the aggravating. I would object to the use of trial aid listing —
 "[Trial court]: I have not looked at those. Do you have one with statutory mitigating?
"[Prosecutor]: Yes, sir.
 "[Trial court]: Okay, that is not to be displayed to the jury. What about the aggravating circumstances? Does it just list the ones you are relying on?
 "[Prosecutor]: No. I have them all, but I will point out to the jury the four the State will be relying on.
"[Defense counsel]: I would request the others be removed.
 "[Trial court]: What is the reason that you would want to present to the jury statutory mitigating circumstances if they claim there is no evidence of them?
 "[Prosecutor]: Just for the purpose of argument. I don't understand how we can even argue to the jury this is a balancing procedure if we can't talk about statutory and nonstatutory mitigating circumstances.
 "[Defense counsel]: Your Honor, the Jury is not limited to the statutory mitigating circumstances. The case law is quite clear on that and Mr. Davis is aware of that. I object to it.
 "[Prosecutor]: I know what the law is, Ms. Wilson. We have to argue the case to the jury and tell them what they can consider and what they can't consider. Are you telling me I am now limited to not to refer to non-statutory mitigating?
 "[Trial court]: You only have to disprove by a preponderance of the evidence any mitigating circumstances, statutory or nonstatutory, which are injected by the defendant. If they do not inject them, you can't disprove them. In other words, there is zero there.
 "[Prosecutor]: Your Honor, just a minute ago, you said after we get into the hearing, if something arises, they can argue them. But you are telling me I can't. If they inject one after we have been denied the right to argue them, that puts the state to a —
 "[Trial court]: In opening statements, and until they inject a statutory mitigating circumstance, I will not allow you to display all the possible statutory mitigating circumstances that any capital defendant anywhere in the State of Alabama might rely on to justify a sentence of life without parole. Because, by doing that, if there is no evidence of any of those, the Jury could infer the lack of such a mitigating circumstance, as in fact, an aggravating circumstance. I don't think that is fair. I will not allow you to argue statutory mitigating circumstances until they present in their evidence some — inject it, and then you can present whatever you want to. In closing, you can argue it as long as you want before they go out.
 "[Prosecutor]: So what you are telling me is that in my opening statement, I will be limited to reference to nonstatutory mitigating?
 "[Trial court]: That's correct. The Jury's duty will be to weigh your aggravating circumstances against any mitigating circumstances. We don't need to refer to them as statutory or nonstatutory to the jury because they don't know *Page 1129 
there is such a fact. You have all of these statutory aggravating or just the ones you are relying on?
"[Prosecutor]: I have them all on the chart.
 "[Defense counsel]: Your Honor, I would ask that any that are not intended to be relied on by the State be redacted or removed.
 "[Prosecutor]: Judge, I'm not going to make reference to them. I'm only going to make reference to the ones the State is relying on. I'm not even going to read the others to them.
 "[Defense counsel]: Your Honor, the exhibit, as I see it, has the listing of all statutory —
 "[Trial court]: Overruled. If you don't refer to them — you just check or do whatever around the ones you are relying on, then I'll instruct them that ones that we have gone over the only aggravating circumstances they are allowed to consider. All right, bring the jury in."
The record indicates that, during the sentencing phase, the prosecutor informed the jury in his opening statement that the State would present evidence "concerning at least four statutory aggravating circumstances." The prosecutor presented evidence of only four statutory aggravating circumstances. Additionally, in his closing argument to the jury, the prosecutor stated, "As the Judge told you, the State relies on four aggravating circumstances and I'll go over those with you now." During the State's rebuttal, the prosecutor again stated, "There are four aggravating circumstances up there you can consider." Moreover, the trial court, in instructing the jury, charged as follows:
 "Now, in this case, the State of Alabama relies on four aggravating circumstances. That is they have submitted to you evidence, and from that evidence, it is their burden to convince you beyond a reasonable doubt of the existence of these four aggravating circumstances. . . . The four aggravating circumstances are as follows: (1) That the capital offense was committed by a person under sentence of imprisonment . . . [(2)] that the defendant was previously convicted of a felony involving the use of threat of violence to a person . . . [(3)] that the capital offense that [he has] previously engaged in or was an accomplice in or that the defendant was in an attempt to commit, or the defendant was in flight after committing a robbery or kidnapping . . . [and (4)] that the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or affecting an escape from custody. . . . You may consider all of those four aggravating — let me let me back up. You can consider any of the four of those aggravating circumstances that you find beyond a reasonable doubt does in fact exist . . . as the jury in this case, you are limited to — in the weighing of the aggravating and mitigating circumstances, you are limited to only considering these four aggravating circumstances that I have just listed for you. . . [Y]ou may only consider those four aggravating circumstances that have been requested by the State in this case."
After reviewing the entire opening and closing statements of the prosecutor, along with his argument on rebuttal, we conclude that none of the statements rose to the level of plain error. Additionally, the appellant has failed to provide any evidence indicating that he was prejudiced by the prosecutor's arguments. Moreover, the trial court's instructions to the jury regarding the four aggravating circumstances imply that the appellant suffered no prejudice as a result of the State's use of the trial aid. Rule 45, Ala.R.App.P.; see Callahan v. State,767 So.2d 380 *Page 1130 
(Ala.Crim.App. 1999); Maples v. State, 758 So.2d 1 (Ala.Crim.App. 1999); Smithv. State, supra (it is presumed that jurors followed the instructions of the trial court). No error occurred here.
 VII.
The appellant argues that the trial court committed reversible error when it allowed Officer Turner's wife, Brandi Turner, and Alabama Bureau of Investigation Investigator Michael Manlief, to remain in the courtroom during trial. Because the appellant failed to object at trial to the presence of either Turner or Manlief, but merely questioned their presence and whether Rule 615, Ala.R.Evid. had been invoked, this argument is subject to review pursuant to the plain-error rule. See Rule 45A, Ala.R.App.P.
Generally, a trial court may exclude witnesses from the courtroom. See Rule 9.3(a), Ala.R.Crim.P. However, with regard to the right of family members of victims to be present in the courtroom, § 15-14-56(a), Ala. Code 1975, provides:
 "Whenever a victim is unable to attend such trial or hearing or any portion thereof by reason of death . . . the victim's family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of this article."
See also Wilson v. State, 777 So.2d 856, 930 (Ala.Crim.App. 1999). (a victim of a criminal offense is entitled to be present in any court exercising any jurisdiction over the offense, and may not be excluded from any hearing or trial that pertains to the offense merely because the victim has been or may be subpoenaed to testify at such hearing or trial, § 15-14-51, Ala. Code 1975; additionally, the victim is "`exempt from the operation of rule of court, regulation, or statute requiring the separation or exclusion of witnesses from court in criminal trial or hearings,'" § 15-14-55, Ala. Code 1975). Rule 615, Ala.R.Evid., provides:
 "At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion. This rule does not authorize exclusion of . . . a victim of a criminal offense or the representative of a victim who is unable to attend. . . ."
Additionally, no error occurred in allowing Investigator Manlief to remain in the courtroom because he was the official "law enforcement representative." See Rule 615, Ala.R.Evid. The record indicates that Investigator Manlief had been the State's case agent since the beginning of the case, and was in charge of the investigation. Therefore, the trial court did not abuse its discretion in allowing him to remain in the courtroom, despite the fact that he was going to testify at trial. In Exparte Lawhorn, 581 So.2d 1179, 1181 (Ala. 1991), the Alabama Supreme Court stated that "Alabama appellate courts have time and again refused to hold it an abuse of discretion on the part of the trial court to allow a sheriff, police chief, or similarly situated person who will later testify to remain in the courtroom during trial." See also Jackson v.State, 502 So.2d 858 (Ala.Crim.App. 1986); Johnson v. State, 479 So.2d 1377
(Ala.Crim.App. 1985); Chesson v. State, 435 So.2d 177 (Ala.Crim.App. 1983), and authorities cited in those cases.
Based on the aforestated legal authority, the trial court did not err in allowing the witnesses to remain in the courtroom. Moreover, the appellant has failed to show that the presence of the witnesses prejudiced him or has or probably has affected his substantial rights. Rule 45A, Ala.R.App.P. Consequently, we find no plain error in this regard. *Page 1131 
 VIII.
The appellant argues that the prosecutor made improper statements in his closing arguments to the jury during both the guilt phase and sentencing phase of his trial.
 A.
The appellant argues that the prosecutor's statement to the jury, during the guilt phase, that Officer Turner was "doing his job, protecting the citizens of Moody in St. Clair County" argued emotion rather than facts.
It is undisputed that Officer Turner was shot while on-duty as a Moody police officer. It is well settled that comments based on facts and evidence are proper argument by the prosecutor. "During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference." Rutledge v. State, 523 So.2d 1087, 1100
(Ala.Crim.App. 1987), rev'd on other grounds, 523 So.2d 1118 (Ala. 1988). "To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted."Twilley v. State, 472 So.2d 1130, 1139 (Ala.Crim.App. 1985). Moreover, because the appellant's motion for a change of venue was granted and the case was heard in Elmore County, the reference protecting the citizens of St. Clair County would not have been as poignant. There was no error on this ground.
 B.
The appellant argues that the prosecutor made improper closing arguments during the penalty phase of his trial. Specifically, the appellant takes issue with the following comments of the prosecutor:
 "Ladies and gentlemen of the jury, the State of Alabama, the Turner family and the law enforcement community of the state does not want any sympathy in this case from anybody. It has no place in your decision. We want justice. The only justice in this case is a death penalty. . . . We want you to come back with a decision that shows Mario Centobie the same amount of mercy that he showed Keith Turner."
The appellant argues that "[b]y characterizing the victims and the law enforcement community almost as parties to the case, the state reduced the proceeding to an `us' vs. `him' match, rather than focusing the jury on Mr. Centobie as a `uniquely individual human being.'"
The record indicates that the prosecutor's argument was made during the State's rebuttal and was permissible as a "reply in kind" to defense counsel's argument in closing that "sentencing [the appellant] to death at this point is not going to bring Officer Turner back. . . . The death of Mario Centobie will not bring or cause his family to suffer any less than what they have suffered and will suffer. There will only be another death. Is that going to bring any redemption for Officer Turner?" This argument, coupled with defense counsel's argument that because the appellant had been at one time a firefighter the jury should show mercy are sufficient grounds for the State's comments made in rebuttal. "When the door is opened by defense counsel's argument, it swings wide, and a number of areas barred to prosecutorial comment would suddenly be subject to reply." Davis v. State, 494 So.2d 851, 855 (Ala.Crim.App. 1986). InStephens v. State, 580 So.2d 11 (Ala.Crim.App. 1990), aff'd, 580 So.2d 26
(Ala. 1991), this Court stated the following regarding prosecutor's arguments and statements. "`[I]t must be examined in its context and in light of what had transpired, that is in light of preceding argument of defense *Page 1132 
counsel, to which the prosecutor's argument was an answer.'"
Additionally, taken in context of its argument, the prosecutor's argument was an appeal to the jury for justice in law enforcement and for the jury to discharge its duties according to law and evidence. See Pricev. State, 725 So.2d 1003, 1033 (Ala.Crim.App. 1997) ("There is no impropriety in a prosecutor's appeal to the jury for justice and to properly perform its duty"). See also Baker v. State, [Ms. CR-95-0292, January 12, 2001] ___ So.2d ___ (Ala.Crim.App. 2001).
 C.
The appellant argues that the victim's wife, Brandi Turner, was allowed to give highly prejudicial victim impact evidence during the guilt phase of the trial.
The record reveals that the appellant did not object to either the question regarding how long the witness and the victim were married or the question regarding the age of their child; thus, we review the testimony under the plain error standard.
In McGriff v. State, [CR-97-0179, September 29, 2000] ___ So.2d ___ (Ala.Crim.App. 2000), the appellant argued that the prosecutor's questioning of the victim's spouse during the guilt phase to elicit testimony concerning his 15-month-old child constituted reversible error because, he says, it was improper victim-impact evidence. Following an evaluation of this argument under the plain-error standard, this Court concluded:
 "Though the evidence relating to the fact that McCree was married and had a young child served no purpose at the guilt stage of trial, we do not believe that its introduction constituted reversible error. We base this holding on the Alabama Supreme Court's holding in Ex parte Rieber, 663 So.2d 999, 1006 (Ala.), cert. denied, 516 U.S. 995 (1995). The Rieber Court stated:
 "`We caution prosecutors that the introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law. However, after examining the record in its entirety, we conclude that the aforementioned portions of [the victim's husband's] testimony, although they should not have been permitted, did not operate to deny Rieber a fair trial. It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspected — that Ms. Craig was not a "human island," but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991)).'"
___ So.2d at ___.
In the present case, the reference to the victim's family was brief and did not amount to plain error.
 IX.
The appellant argues that the trial court erred in admitting into evidence *Page 1133 
photographs of the slain victim. He argues that the photographs served no purpose other than to prejudice the jury against him.
 "Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. . . . Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91
(Ala.Cr.App. 1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App. 1984)."
Ex parte Siebert, 555 So.2d 780, 783-784 (Ala. 1989), cert. denied,497 U.S. 1032 (1990).
Because the photographs depicted the gunshot wounds and were used to corroborate the testimony of the state's medical examiner, the trial court did not err in admitting the photographs into evidence. Perry v.State, 647 So.2d 71, 75 (Ala.Crim.App. 1994).
 X.
The appellant argues that the trial court erred in informing the courtroom audience and the victim's family members of the nature of the medical examiner's testimony in the presence of the jury.
The record does not support the appellant's argument that the jury was present at the time in question. In fact, the record indicates that the trial court, before it made its remarks regarding the expected testimony of the medical examiner, instructed the jury not to discuss the case with anyone and recessed for 15 minutes. The record further indicates that the jury was again seated in the jury box after the trial court had completed its comments. No error occurred here.
 XI.
The appellant argues that he was prejudiced by the trial court's failure to sequester the jury, by its failure to give more specific cautionary instructions, and by its failure to strike Juror J.F. for cause.
 A.
The appellant argues that the trial court erred when it failed to sequester the jury. He argues that sequestration was necessary because of the great amount of publicity surrounding his case and because several potential jurors had indicated during voir dire examination that they had been exposed to pretrial media coverage. The record reveals that the appellant failed to object to the trial court's failure to sequester the jury; therefore, this argument is subject to review for plain error. See Rule 45A, Ala.R.App.P.
The trial court, in allowing the jury to separate, acted pursuant to § 12-16-9, Ala. Code 1975, amended effective June 15, 1995. That section provides:
 "In the prosecution of any felony case the trial court in its discretion may permit the jury hearing the case to separate during the pendency of the trial. The court may at any time on its own initiative or on motion of any party, require that the jury be sequestered under the charge of a proper officer whenever they leave the jury box or the court may allow them to separate."
Thus, the trial court acted within its discretion in allowing the jury to separate.
Moreover, there is no indication in the record that the appellant suffered any prejudice by the failure to sequester the *Page 1134 
jury. Rule 19.3(a), Ala.R.Crim.P., amended effective December 1, 1997, to ensure conformity with § 12-16-9, Ala. Code 1975, provides, in pertinent part:
 "(1) In the prosecution of any felony case, the trial court, in its discretion, may permit the jury hearing the case to separate during the pendency of the trial. Such a separation of the jury shall create a prima facie presumption that the accused was not prejudiced by reason of the separation.
 "(2) The court may, at any time, on its own initiative or on motion of any party, require that the jury be sequestered under the charge of a proper officer whenever the jurors leave the jury box, or the court may allow the jury to separate. A motion to separate or sequester shall not be made within the hearing of the party, if any, requested the separation or sequestration."
See also Broadnax v. State, [Ms. CR-97-0113, June 30, 2000] 825 So.2d 134, (Ala.Crim.App. 2000); Ex parte Stewart, 730 So.2d 1246 (Ala. 1999), cert. denied, 528 U.S. 846 (1999) (the Alabama Supreme Court stated that this court "correctly held that § 12-16-9 [Ala. Code 1975] overrode the conflicting portions of Rule 19.3, [Ala.R.Cr.P.]." Id. at 1250.)
The record indicates that the appellant presented no evidence to the trial court to rebut the prima facie presumption that he was not prejudiced by the court's failure to require sequestration. With the exception of Juror J.F., there is no indication that any potential juror who had been exposed to media coverage of the case actually served on his jury. The appellant has presented to this Court only bare allegations of prejudice that, he says, resulted from the trial court's failure to sequester the jury. This Court will not base a finding of error on speculation and conjecture. See McNair v. State, 706 So.2d 828, 838
(Ala.Crim.App. 1997). Moreover, the fact that the trial court granted the appellant's motion for a change of venue weighs heavily against any claim of prejudice. Based on the record before us, we find that no error occurred, much less plain error. Rule 45A, Ala.R.App.P.
 B.
The appellant argues that the trial court erred in failing to give instructions to the jury that would ensure that the jury was not "contaminated by irrelevant and prejudicial outside information." In support of his argument, he contends that the trial court should have given cautionary instructions before each recess.
The record indicates that immediately after swearing in the jury, the trial court charged it as follows:
 "The only instructions I'm going to give you at this point are the instructions that will be given to you and will be repeated over and over again. You will grow tired of hearing them. Every time we take a break, here are the instructions you must follow — let me back up. You will not be sequestered. That means you will not be locked up overnight. We trust you that you will follow these instructions. That by releasing you and allowing you to go home every night, that means it is very, very important that you do follow these instructions. That you not attempt to gain any sort of outside information or communicate with anybody concerning this case. Here are the instructions: As long as you are a juror in this case, number one, you may not talk to anyone about this case. That means your husband, your wife, your brother or sister or children, neighbor[s], friends — anyone. You may not talk to anyone about this case. We do not want anyone giving you any information about this case that you may not *Page 1135 
have already. We do not want anyone giving you their opinion or any ideas about the case. You are the people who have just taken an oath that you will decide this case based on the evidence that comes from the witness stand. We do not want any pressure on you from any source. All we want you to do is listen to the evidence, reach your impressions based on the evidence and the testimony and law as I instruct you in making your decision."
The trial court exhaustively and completely instructed the jury as to these rules for separation.
Contrary to the appellant's contention, a mere "chance" of contamination from outside information is simply not sufficient to warrant reversal. As we have stated time and again, we will not base error on speculation and conjecture. See McNair v. State, supra. The trial court gave a detailed instruction in which the jurors were repeatedly told not to read or to watch media accounts of the case and not to attempt any independent investigation. The trial court was not obliged to give such an instruction every time the jury took a break during the trial. It is clear from the record that the members of the jury were more than aware that they were not to have any outside exposure concerning the case. In Griffin v. State, [Ms. CR-97-1026, Dec. 10, 1999]790 So.2d 267 (Ala.Crim.App. 1999), rev'd on other grounds, [Ms. 1991354, August 18, 2000] 790 So.2d 351 (Ala. 2000), the appellant argued that the trial court should have charged the jury each time it separated; however, this Court rejected that argument, stating:
 "Although the better practice would be for the trial court to admonish the jury at each break or recess, there is nothing in Rule 19.3(b), Ala.R.Crim.P., that requires it to do so. . . . Jurors are presumed to follow the instructions of the trial court. Taylor v. State, 666 So.2d 36 (Ala.Cr.App.), aff'd, 666 So.2d 73
(Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)."
Id. at 334.
Additionally, the record does not indicate that any of the jurors told the trial court of having been exposed to any extraneous influences, thereby obviating the need for additional instruction from the trial court. See Minor v. State, 780 So.2d 707, 758 (Ala.Crim.App. 1999), rev'd on other grounds, [Ms. 1990235, July 21, 2000] 780 So.2d 796 (Ala. 2000). The present case indicates that the trial court acted within its discretion by allowing the jury to separate after adequately instructing the members. Id.
 C.
The appellant argues that the trial court erred in failing to strike Juror J.F. for cause "even after she divulged information indicating that she would be biased against [him]."
In determining whether a veniremember should be excused for cause, the trial court should apply the following test:
 "`Ultimately, the test to be applied is whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence. Tidmore v. City of Birmingham, 356 So.2d 231
(Ala.Cr.App. 1977), cert. denied, 356 So.2d 234
(Ala.), cert. denied, 439 U.S. 836, 99 S.Ct. 120, 58 L.Ed.2d 132 (1978); see Willingham v. State, 262 Ala. 550, 552, 80 So.2d 280 (1955); Mahan v. State, 508 So.2d 1180
(Ala.Cr.App. 1986). This determination, again is to be based on the juror's answers and demeanor and is within the sound discretion of the trial judge.'"
Ex parte Windsor, 683 So.2d 1042, 1047 (Ala. 1996), cert. denied,520 U.S. 1171 *Page 1136 
(1997) (quoting Knop v. McCain, 561 So.2d 229, 232 (Ala. 1989)).
In an attempt to clarify the veniremember's responses during the voir dire examination as to what she had heard about the case, the trial court engaged in the following discussion with Juror J.F.:
 "[The Court]: You indicated earlier that you had heard something about this case?
"[J.F.]: Yes
 "[The Court]: Can you tell us a little about what you heard and when it was you heard it?
"[J.F.]: When it first happened.
"[The Court]: What did you hear?
 "[J.F.]: I work in an office . . . that deals with chaplaincy. We have chaplains with the sheriff's departments, police departments and Department of Public Safety. One of our supervisors is a chaplain in Escambia County. He was talking about the chaplains of St. Clair County ministering to the police officers there. I could not have told you the names of anybody involved. I have not kept up with it since then.
 "[The Court]: I asked you earlier if there is anybody who already had their mind made up about this case. What you had heard previously, would you be able to put that aside and make an independent honest evaluation based on the evidence in this case or would what you have heard — would you use that to make your decision in this case?
 "[J.F.]: I cannot even remember the facts in the case. I could not tell you exactly right now what happened because I do not work directly with this chaplain. The other secretary in the office does. I think I could.
 "[The Court]: If you were selected as a juror in this case and you heard all the evidence in the case, based on the evidence, you felt the State had not proven the defendant guilty beyond a reasonable doubt, could you return a verdict of not guilty?
"[J.F.]: Yes
"[The Court]: Questions by either side?
"QUESTIONED BY DEFENSE COUNSEL:
 "[Defense counsel]: You said the reports you heard were when the events allegedly occurred?
"[J.F.]: Yes.
 "[Defense counsel]: Was there one or many reports that you heard?
 "[J.F]: I guess I heard several. I would hear it on T.V. The main thing was through the chaplain that I worked with.
 "[Defense counsel]: Did you have any direct conversations with him regarding his services?
 "[J.F.]: He did not minister to them himself. It was other chaplains that he knew.
 "[Defense counsel]: There was general conversation in the office?
"[J.F.]: Yes.
"[Defense counsel]: Did you follow it on the news?
 "[J.F.]: I may have seen bits and pieces on the news as it came in, but I did not actually sit down and watch it and listen to it. That is the time I'm fixing supper when I come home.
 "[Defense counsel]: How may reports would you say you heard?
 "[J.F.]: Maybe three or four. I do read the newspaper at work. It is part of my job to get information on moral and ethical issues we keep in the file. I might have seen a headline in the paper, but I didn't really read that because that was not what I was looking for. *Page 1137 
 "[Defense counsel]: Have you seen anything recently in the papers or on T.V.?
 "[J.F.]: I saw last night when the news came on saying this case was coming up today and it scared me to death because I knew I was going to be here.
"[Defense counsel]: Are you scared now?
 "[J.F.]: Of course, I'm nervous or apprehensive about it. I'd rather not be here.
 "[Defense counsel]: Do you know anything in particular — do you feel you have any special knowledge regarding this case?
 "[J.F.]: I know there were two people involved, but I don't know anything else.
 "[Defense counsel]: Do you have an opinion as to Mr. Centobie's guilt or innocence?
 "[J.F.]: Not at this point, I do not, because I don't remember any circumstances.
 "[Defense counsel]: Did you read Thursday's Wetumpka paper?
"[J.F.]: No.
"[Defense counsel]: Do you normally get the paper?
"[J.F.]: No.
 "[Defense counsel]: Other than that one news report last night regarding this case, have there been any others about the upcoming trial that you have heard?
"[J.F.]: No.
 "[Defense counsel]: Do you still have contact with that chaplain?
"[J.F.]: He is one of my bosses.
 "[Defense counsel]: Was there any other conversation at work regarding this upcoming trial?
 "[J.F.]: No. He is only part-time and just comes two days a week.
 "[Defense counsel]: Have you had any conversation with anyone regarding something like `I got subpoenaed and I hope I'm not picked'?
 "[J.F.]: I didn't know this was the case when I got my subpoena or jury summons. I served one time before on a grand jury, and I just felt it was going to be Circuit Court for Elmore County. I had no idea it was going to be this.
 "[Defense counsel]: You have not told anybody you might be on this case?
"[J.F.]: No.
"[Defense counsel]: No discussion with anybody about it?
"[J.F.]: No.
 "[The Court]: [J.F.], I will instruct everyone not to talk about this case with anyone and not to discuss this with any family member. We don't want any other information that someone else has. Could you follow that particularly in view of the fact where you work and they may have some contact about this case? Could you follow that instruction and not talk about it?
"[J.F.]: Yes, I can."
After a careful examination of the record, it is clear that from the beginning of voir dire, Juror J.F. answered all questions honestly and forthrightly. She indicated that she knew very little about the facts of the case, that she had an open mind, and that she was not subject to any preconceived notions regarding the guilt or innocence of the appellant. "`The mere knowledge of the facts and issues in this case, as in any case, does not disqualify a potential juror from serving on the case.'Kinder v. State, 515 So.2d 55, 59-61 (Ala.Crim.App. 1987.); Harris v.State, 632 So.2d 503, 519 (Ala.Crim.App. 1992), aff'd, 632 So.2d 543
(Ala. 1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004
(1995)." Wilkerson v. State, 686 So.2d 1266, 1269-70 (Ala.Crim.App. 1996). Therefore, we conclude that the trial court *Page 1138 
did not abuse its discretion when it refused to remove Juror J.F. for cause.
 XII.
The appellant argues that his rights to due process, a fair trial, and a reliable sentencing, protected by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, by the Alabama Constitution, and by Alabama law, were violated when the trial court allowed into evidence a .45 caliber bullet recovered from the clothing of Officer Turner. Specifically, he contends that at some point following the trial of his codefendant, Jeremy Granberry, the bullet had fallen through a hole in the bag used for storing the evidence. He argues that, after a search, a bullet was apparently recovered on the floor of the evidence room and was presented to the court as evidence. He argues that the admission of the evidence "injected severe unreliability into the most serious criminal proceeding our system of justice allows."
Because the appellant failed to object to the admission of this evidence, his argument will be reviewed under the plain-error standard. Rule 45A, Ala.R.App.P.
In Ex parte Scott, 728 So.2d 172, 182 (Ala. 1998), the Alabama Supreme Court, quoting Knight v. State, 659 So.2d 931, 932 (Ala.Crim.App. 1993), stated:
 "`In Ex parte Holton, 590 So.2d 918, 920 (Ala. 1991), the Alabama Supreme Court stated:
 "`"The chain of custody is composed of `links.' A `link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: `(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' Imwinklereid, The Identification of Original, Real Evidence, 61 Mil.L.Rev. 145, 159 (1973).
 "`"If the State, or any other proponent of demonstrative evidence, fails to identify a link or failed to show for the record any one of the three criteria as to each link, the result is a `missing' link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the `link,' as to one or more criteria or as to one or more links, the result is a `weak' link. When the link is `weak,' a question of credibility and weight is presented, not one of admissibility."'"
An examination of the record indicates that the State established a proper chain of custody for the admission of the evidence. The bullet was found inside the clothing Officer Turner was wearing on the night he was shot. It was recovered by the medical examiner who examined the victim's body, Dr. Stephen Pustilnik. This discovery took place during the initial inspection of the body at the crime scene. Dr. Pustilnik secured the bullet until it was turned over to Ed Moran, who was employed by the Department of Forensic Sciences. Moran then marked the bullet for future identification. It was this mark that allowed Moran to state with certainty that State's Exhibit 34 was the same projectile recovered by Dr. Pustilnik. Thus, the circumstantial and direct evidence established that the bullet was received, retained, and safeguarded by the police. *Page 1139 
Additionally, the bullet was admissible under § 12-21-13, Ala. Code 1975; that section states:
 "Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in criminal trial identifies a piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."
See also Ex parte Scott, supra, at 182 ("`[c]hain of custody requirements do not apply with the same force to items of evidence which are unique and identifiable in themselves'").
Lastly, the appellant admitted during his testimony that he was in possession of the .45-caliber Ruger pistol belonging to Sheriff Hooks at the time of his arrest and that he had fired the pistol at Officer Turner. The appellant has failed to show any substantial prejudice as a result of the admission into evidence of the bullet. Rule 45A, Ala.R.App.P. Accordingly, we find no plain error as to this claim.
 XIII.
The appellant argues that the trial court's instruction to the jury that it had a duty to reconcile the testimony of the witnesses violated his right to a fair trial. Specifically, the appellant takes issue with the following instruction of the trial court, made at the close of the guilt phase:
 "The law says you should attempt to reconcile the testimony so as to make all the witnesses speak the truth if this can reasonably be done. However, if there was a conflict between the testimony of two or more witnesses, then it is your job to decide if that conflict exists, which witness you choose to believe and which witness you choose not to believe."
In support of his argument, he contends that the aforestated charge mirrors an instruction held to be improper in Williams v. State,601 So.2d 1062, 1076 (Ala.Crim.App. 1991), as to which this Court noted, "[w]hen viewed in the abstract, . . . [it] could be confusing." TheWilliams Court, nevertheless, found no error in the instruction when viewed in the context of the entire charge.
As in Williams, the trial court's instruction in this case, taken in context, was proper. It is well settled that "[a] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Kuenzel V. States, 577 So.2d 474, 517
(Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala. 1991), cert. denied,502 U.S. 886 (1991). Here, the trial court's instruction informed the jury that it should evaluate the credibility of all of the evidence and witnesses in determining the facts and in reaching its decision. The instruction properly summarized the jury's role as the sole fact-finder in the case. See Hyde v. State, 778 So.2d 199 (Ala.Crim.App. 1998). The jury has the "responsibility of assessing the credibility of each witness and weighing all the evidence, whether direct or circumstantial, as they viewed it." Cumbo v. State, 368 So.2d 871 (Ala.Crim.App. 1978), cert. denied, 368 So.2d 877) (Ala. 1979). "A conflict in the testimony is the sole province for the jury to determine. . . ." Boggan v. State,455 So.2d 228, 240 (Ala.Crim.App. 1984). Therefore, there was no error in the above instruction. *Page 1140 
 XIV.
The appellant argues that the trial court erred in admitting into evidence State's Exhibit 23, a still photograph copied from a surveillance camera at the Leeds/Moody Taco Bell restaurant, which established that he was at the restaurant on June 27, 1998, the day of Officer Turner's murder. In support of his argument, the appellant contends that the requirements for the photograph's admissibility were not met because, he says, it was not properly authenticated as to date and time.
Initially, we note that during the appellant's testimony at trial, he not only admitted to having been in Moody on June 27, 1998, when Officer Turner was shot and killed, but he also admitted to having gone to the Taco Bell restaurant that same evening around 7:00 P.M. for dinner. Because the appellant's own testimony established that he had been at the Taco Bell restaurant on the date of the murder, there was no error in admitting the still photograph because it was cumulative evidence of the appellant's testimony. Rule 45, Ala.R.App.P.
Moreover, the still photograph was properly admitted into evidence. Any problem with respect to the photograph goes to the weight accorded the evidence by the jury and not to its admissibility. We base our holding on the Supreme Court's opinion in Ex parte Rieber, 663 So.2d 999, 1008-09
(Ala. 1995):
 "`Traditionally, courts and commentators analyzing the issue of the admissibility of sound recordings, photographs, motion pictures, videotape recordings, maps, and diagrams have treated all these items in the same manner. See 3 James H. Chadbourn, Wigmore on Evidence, § 790 (1970 Supp. 1991); 2 John W. Strong, McCormick on Evidence § 214 (1992); William A. Schroeder, et al., Alabama Evidence, § 11-3 (1987 Supp. 1988); F.M. English, Annotation, Admissibility of Sound Recordings in Evidence, 58 A.L.R.2d 1024 (1958); and see, International UAW-CIO v. Russell, 264 Ala. 456, 470, 88 So.2d 175, 186
(1956) (discussing the "pictorial communication" theory as applied to motion pictures); National States Ins. Co. v. Jones, 393 So.2d 1361, 1366 (Ala. 1980) (discussing tape recordings); and C.P. Robbins Associates v. Stevens, 53 Ala. App. 432, 437, 301 So.2d 196, 200-01 (1974) (discussing tape recordings). In fact, in National States Insurance, this Court stated, "A tape recording of a pertinent event is analogous to a photograph of a scene. A recording preserves the situation as it took place just as a photograph preserves the scene as it existed at a given point." 393 So.2d at 1367.
 "`There are two theories upon which photographs, motion pictures, videotapes, sound recordings, and the like are analyzed for admission into evidence: the "pictorial communication" or "pictorial testimony" theory and the "silent witness" theory. Wigmore, supra, § 790; McCormick, supra, § 214; and Schroeder, supra, § 11-3. The "pictorial communication" theory is that a photograph, etc., is merely a graphic portrayal or static expression of what a qualified and competent witness sensed at the time in question. Wigmore, supra, 790, and McCormick, supra, § 214. The "silent witness" theory is that a photograph, etc., is admissible, even in the absence of an observing or sensing witness, because the process or mechanism by which the photograph, etc., is made ensures reliability and trustworthiness. In essence, the process or mechanism substitutes for the witness's senses, and because the process or mechanism is explained before the *Page 1141 
photograph, etc., is admitted, the trust placed in its truthfulness comes from the propositions that, had a witness been there, the witness would have sensed what the photograph, etc., records. Wigmore, supra, § 790, and McCormick, supra, § 214.
 "`A reasonable reading of [Voudrie v. State, 387 So.2d 248
(Ala.Crim.App. 1980), cert. denied, 387 So.2d 256
(Ala. 1980); Carraway v. State, 583 So.2d 993
(Ala.Crim.App. 1991), cert. denied, 583 So.2d 997
(Ala. 1991); Molina v. State, 533 So.2d 701
(Ala.Crim.App. 1988), cert. denied, 489 U.S. 1086, 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989),] and the more recent caselaw of the Court of Criminal Appeals leads us to conclude that the Court of Criminal Appeals is of the opinion that the "pictorial communication" and "silent witness" theories are mutually exclusive theories, rather than alternative theories. The proper foundation required for admission into evidence of a sound recording or other medium by which a scene or event is recorded (e.g., a photograph, motion picture, videotape, etc.) depends upon the particular circumstances. If there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question, then the "silent witness" foundation must be laid. Under the "silent witness" theory, a witness must explain how the process or mechanism that created the item works and how the process or mechanism ensures reliability. When the "silent witness" theory is used, the party seeking to have the sound recording or other medium admitted into evidence must meet the seven-prong Voudrie test. Rewritten to have more general application, the Voudrie standard requires:
 "`(1) a showing that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded,
 "`(2) a showing that the operator of the device or process or mechanism was competent,
 "`(3) establishment of the authenticity and correctness of the resulting recording, photograph, videotape, etc.
 "`(4) a showing that no changes, additions, or deletions have been made.
 "`(5) a showing of the manner in which the recording, photograph, videotape, etc., was preserved.
 "`(6)identification of the speakers, or persons pictured, and
 "`(7) for criminal cases only, a showing that any statement made in the recording, tape, etc., was voluntarily made without any kind of coercion or improper inducement.
 "`On the other hand, when a qualified and competent witness can testify that the sound recording or other medium accurately and reliably represents what the witness sensed at the time in question, then the foundation required is that for the "pictorial communication" theory. Under this theory, the party offering the item must present sufficient evidence to meet the "reliable representation" standard, that is, the witness must testify that the witness has sufficient personal knowledge of the scene or events pictured or the sounds recorded and that the item offered accurately and reliably represents the actual scene or sounds.'"
Our review of the record indicates that the State laid the necessary evidentiary foundation for admitting the still photograph copied from the videotape under the "pictorial communication" theory. The *Page 1142 
State presented sufficient evidence to meet the "reliable representation" standard through the testimony of James Anthony Berry, a former general manager of the Leeds/Moody Taco Bell restaurant, who was working the night the appellant was captured on the surveillance film. Berry testified that all Taco Bell restaurants have surveillance cameras that run continuously for seven days. He testified that he had watched the videotape taken from the restaurant on June 27, 1998, and that it fairly and accurately depicted specific features of the Leeds/Moody restaurant on that particular day. Berry then identified the still photograph copied from the videotape and testified that it was an accurate representation of the restaurant's front counter. He further testified that the photograph captured the image of one of his employees. Berry testified that part of his duties as a general manager included checking the surveillance tape to ensure that it was functioning correctly. He further testified that this duty was left to the opening manager for the day, and because he did not report for work until the afternoon shift, he did not have occasion to examine the security system that particular day. He did, however, testify that there had been no problems with the security system all week. Additionally, Berry testified that, although he had never had to do so, as a general manager, his duties included calibrating the surveillance tape to match the date and time of the pre-programmed cash registers, if necessary. Subsequently, the State offered the still photograph into evidence. Defense counsel objected, stating as grounds that "there has been no evidence as to — it has a date and time stamped on it. There is no evidence how this was calibrated — if this was added after the fact and how it was generated." The trial court then questioned the witness concerning whether the picture was a still photograph made from the videotape he had observed, and whether the videotape was the type of tape that was normally kept by Taco Bell. After Berry responded affirmatively, the trial court admitted the photograph.
The trial court did not err in admitting the photograph under the "pictorial communication" theory. Because there was overwhelming evidence of the appellant's guilt, including his testimony, in which he admitted that he was at the restaurant on the night in question, he has failed to show any prejudice as a result of the admission of the photograph. Rule 45, Ala.R.App.P.
 XV.
The appellant argues that the manner of execution used by the state of Alabama constitutes cruel and unusual punishment. However, it has previously been held on numerous occasions that death by electrocution does not constitute cruel and unusual punishment. Sullivan v. Dugger,721 F.2d 719 (11th Cir. 1983); Lindsey v. Smith, 820 F.2d 1137, 1155
(11th Cir. 1987), cert. denied, 489 U.S. 1059 (1989); Lowenfield v.Phelps, 817 F.2d 285 (5th Cir. 1987), aff'd, 484 U.S. 231 (1991).
 "The United States Supreme Court addressed the death by electrocution issue in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In determining what constitutes cruel and unusual punishments the Court stated: `Punishments are cruel when they involve torture or lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies that there is something inhuman or barbarous — something more than the mere extinguishment of life.' Id. at 447, 10 S.Ct. at 933. In holding that such a punishment is not cruel or unusual, the Court reasoned `that this act was passed in the effort to devise a more humane method *Page 1143 
of reaching the result.' Id. Accord Spinkellink v. Wainwright, 578 F.2d 582, 616 (5th. Cir. 1978). Appellant's contention is therefore without merit; death by electrocution does not amount to cruel and unusual punishment per se, but is a constitutional means of imposing a sentence of death."
Jackson v. State, 516 So.2d 726, 737 (Ala.Crim.App. 1985), remanded on other grounds, 516 So.2d 768 (Ala. 1986).
 XVI.
The appellant argues that the Alabama statute, § 15-12-21(d), Ala. Code 1975, which limits to $1,000 the fees of court-appointed attorneys for out-of-court work in each phase of a capital case, violates state and constitutional law. Specifically, the appellant argues that the statute is unconstitutional, because, he says, by limiting compensation to $1,000 for out-of-court work, based on a $20 hourly rate, the statute assures that an appointed attorney in a capital case receives no compensation for any time expended beyond 50 hours for out-of-court work. Therefore, the appellant argues, the statute violates the separation-of-powers doctrine, constitutes a taking without just compensation, deprives indigent defendants of the effective assistance of counsel, and violates the Equal Protection Clause. The appellant raised this issue for the first time on appeal, so it must be analyzed pursuant to the plain-error rule. Rule 45A, Ala.R.App.P. This Court has, however, rejected similar claims evaluated pursuant to the plain-error rule, and adheres to its decisions on this matter. See McWhorter v. State, 781 So.2d 257 (Ala.Crim.App. 1999); Boyd v. State, 715 So.2d 825 (Ala.Crim.App. 1997). This Court stated in McWhorter:
 "It should be noted that the Alabama Legislature recently passed the `Investment in Justice Act of 1999,' and, in pertinent part, that Act amended § 15-12-21. Under the new Act, the rate of compensation for attorneys representing indigent criminal defendants is increased to $50 per hour for in-court time and $30 per hour for out-of-court time, with no limit on compensation for an attorney in a case involving a capital offense. Moreover, effective October 1, 2000, the hourly rate increases to $40 per hour for out-of-court time and $60 per hour for in-court time. As amended § 15-12-21(d) reads, in pertinent part:
 "`(d) Counsel appointed in cases described in subsections (a), (b), and (c), including cases tried de novo in circuit court on appeal from a juvenile proceeding, shall be entitled to receive for their services a fee to be approved by the trial court. The amount of the fee shall be based on the number of hours spent by the attorney in working on the case and shall be computed at the rate of fifty dollars ($50) per hour for time expended in court and thirty dollars ($30) per hour for time reasonably expended out of court in preparation of the case. Effective October 1, 2000, the amount of the fee shall be based on the number of hours spent by the attorney in working on the case and shall be computed at the rate of sixty ($60) per hour for time expended in court and forty ($40) per hour for time reasonably expended out of court in preparation of the case. The total fees paid to any one attorney in any one case, from the time of appointment through the trial of the case, including motions for new trial, shall not exceed the following:
 "`(1) In cases where the original charge is a capital offense or a charge which carries a possible sentence of life without parole, there shall be no limit on the total fee.'"
781 So.2d at 306-07.
 XVII.
The appellant argues that the cumulative effect of all of the aforestated *Page 1144 
claims of error was prejudicial and entitles him to a new trial and sentencing hearing under state and federal law. The claimed errors to which the appellant refers, however, have been determined to be without merit. "[B]ecause no single instance of alleged improper conduct constituted reversible error, this Court will not consider the cumulative effect to be greater error." Crymes v. State, 630 So.2d 120, 123-24
(Ala.Crim.App. 1993), aff'd, 630 So.2d 125 (Ala. 1993). See also Boyd v.State, 715 So.2d at 851. The appellant is not entitled to relief as to this claim.
 XVIII.
As required by § 13A-5-53, Ala. Code 1975, we address the propriety of the appellant's conviction and his sentence of death. The appellant was indicted and convicted of capital murder, see § 13A-5-40(a)(5), Ala. Code 1975, for intentionally killing Officer Keith Turner, a police officer, while he was on duty.
The record reflects that the appellant's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factors. See § 13A-5-53(b)(1), Ala. Code 1975.
A review of the record shows that the trial court correctly found the existence of four aggravating circumstances: (1) that the capital offense was committed by a person under a sentence of imprisonment; (2) that the defendant had been previously convicted of another capital offense or felony that involved the use of threat of violence to a person; (3) that the capital offense was committed while the defendant was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit a robbery and kidnapping; and (4) that the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. The trial court correctly considered all of the statutory mitigating circumstances, but found that none existed. Additionally, the trial court found the presence of two nonstatutory mitigating circumstances: (1) that the defendant was at one time a public servant — a firefighter with an outstanding record of public service; and that the defendant had on prior occasions exhibited meritorious service in protecting members of the public; and (2) the circumstances of the defendant's upbringing as related in detail in the presentence report. The trial court weighed the mitigating circumstances and the aggravating circumstances and properly determined that the aggravating circumstances outweighed the mitigating circumstances. We agree.
As required by § 13A-5-53(b)(2), Ala. Code 1975, this Court must independently weigh the aggravating circumstances and the mitigating circumstances to determine the propriety of the appellant's death sentence. After an independent weighing, this Court is convinced that the appellant's sentence of death is the appropriate sentence.
Section 13A-5-53(b)(3), Ala. Code 1975, provides that we must also address whether the appellant's sentence was disproportionate or excessive when compared to sentences imposed in similar cases. The appellant's sentence was neither. See, e.g., Hyde v. State, [CR-95-2036, January 30, 1998] 778 So.2d 199 (Ala.Crim.App. 1998), aff'd, [Ms. 1971109, March 10, 2000] 778 So.2d 237 (Ala. 2000); Madison v. State,718 So.2d 90 (Ala.Crim.App. 1997), aff'd, 718 So.2d 104 (Ala. 1998).
We have searched the entire record for any error that might have adversely affected the appellant's substantial rights during the guilt phase or the sentencing phase of this trial; we have found none. Rule 45A, Ala.R.App.P. *Page 1145 
The appellant received a fair trial. His conviction and sentence of death are proper. Therefore, the judgment of the circuit court is due to be, and it is hereby, affirmed.
AFFIRMED.
COBB, BASCHAB, SHAW, and WISE, JJ., concur.